241 P.2d 804

## STATE TAX COMMISSION v. EAGLE PICHER MINING & SMELTING CO.
### No. 5316.

Supreme Court of Arizona.

March 10, 1952.

Rehearing Denied April 8, 1952.

Fred O. Wilson, Atty. Gen., Perry M. Ling, Chief Asst. Atty. Gen., and Earl Anderson, Asst. Atty. Gen., for appellants.

Ben C. Hill, of Tucson, and Norman S. Hull, of Phoenix, for appellee.

LA PRADE, Justice.

This is an appeal from the judgment of the Superior Court of Pima County, Arizona, adjudging the full cash value of the mines, plant and equipment of the appellee corporation to be the sum of $306,386.03 for the purpose of taxation for the tax year of 1949. The judgment is challenged on the ground that it is contrary to the evidence and law applicable.

The proceedings in the superior court originated as an appeal from the appraisal and assessment fixed by the state tax commission sitting as the state board of equalization on the San Xavier group of producing mines situate in the Pima mining district, Pima County, Arizona, owned and operated by the appellee Eagle Picher Mining & Smelting Company, hereinafter referred to as the company. The amount of the assessment, as fixed and reviewed by the commission, on the mines only was $1,000,000. The amount of assessment on the plant and equipment, as fixed by the county assessor of Pima County was the sum of $146,405, making the total amount of assessment for the mines, plant and equipment in the sum of $1,146,405.

The trial court found that the foregoing assessment was excessive and further found the full cash value of the mine, plant and equipment to be the sum of $306,386.03 and found the full cash value of the mine only, after deducting the assessed value of the plant and equipment from the overall valuation, to be the sum of $159,981.03. The company, prior to prosecuting its appeal to the superior court, paid under protest to the county treasurer the full amount of taxes levied and assessed against its property on the valuation of $1,146,405, following the provisions of Section 73–110, A.C.A.1939. The protest was to the effect that the assessment was excessive in the sum of $986,423.97.

At the hearing before the superior court, the company called and examined two witnesses, Mr. L. A. Walker and Mr. Herbert M. Fay, mining engineers, both of whom qualified as experts on mine valuations. The state offered no evidence. These witnesses testified in details as to the value of the property and how they arrived at such value. Each of the witnesses testified that he was of the opinion that the full cash value of appellee's mines and equipment, including railroad spur, mill, office building and other buildings at the mine, was $306,386.03; and that in arriving at this value they assessed the mine and plant as a unit for the asserted reason that the plant, mill and personal property were of no value, except for salvage purposes, without the mine and likewise that the mine was of no value without the plant, mill and personal property.

The court, in order to find the full cash value of the mine as distinct from the plant and surface properties for taxation purposes, subtracted the amount fixed by the

county assessor, to wit, $146,405, as the assessed valuation of the plant, mill and personal property, from the estimates of the engineers.

The following tabulation, submitted by counsel for appellee, contains, we believe, an accurate analysis and summarizes the engineering testimony as to the valuation:

| | Mined 46,308 Tons | Reserve 46,980 Tons |
|---|---|---|
| Estimated Value Ore Reserves........ | $1,613,531.64 | $1,349,735.40 |
| Less Cost of Production and Marketing ........................ | 1,377,663.00 | 1,304,634.60 |
| Estimated Profit on Ore Reserves.... | $ 235,868.64 | $ 45,100.80 |
| Total Profit Ore Reserves ...................... | | $ 280,969.44 |
| Discount future profits to cash value using Hoskold Table with 8% risk rate and 4% redemption. Life of mine one year. | | |
| Factor 0.92593 ............................. | | 260,158.03 |
| Scrap value of plant estimated at $50,000 with 4% discount for two years to reduce to cash value. | | |
| Factor 0.92456 ............................. | | 46,228.00 |
| Total Cash Value Mine and Equipment............ | | $ 306,386.03 |
| Less assessed value of personal property........ | | 146,405.00 |
| Value of Mining Property ............... | | $ 159,981.03 |

It is the position of the state that the judgment is erroneous in that the evidence shows the entire holdings to be valued for tax purposes before discounts at $427,374.44. This sum is arrived at by the following tabulation:

Total Profit (value of ore).... $280,949.44
plus Assessed Value of Personal Property made by the County Assessor .......... 146,405.00

Total cash value of Mine and Equipment ................ $427,374.44
Total cash value of Mine and Equipment after discounts.. $405,000.92

It is the position of the state that the assessment made by the county assessor of the plant, equipment and personal property was final and could not be changed or lowered in the trial court since there had been no appeal from this assessment. In this behalf it is contended that the trial court should not have considered the valuation placed on said personal property by the appellee's witnesses, and that the trial court in accepting the evidence as to the salvage value of the personal property indirectly reduced the value of the personal property as theretofore fixed by the county

assessor. These contentions are without merit since the precise point has heretofore been decided and we see no occasion to depart from the holdings in previous cases setting forth the formula to be adopted in arriving at the full cash value of a producing mine. The rules are clearly set forth in State Tax Commission v. United Verde Extension Mining Co., 39 Ariz. 136, 4 P.2d 395, rehearing denied 39 Ariz. 331, 6 P.2d 889; State Tax Commission v. Magna Copper Co., 41 Ariz. 97, 15 P.2d 961; and State Tax Commission v. Phelps Dodge Corp., 62 Ariz. 320, 157 P.2d 693. The identical contentions set forth here were made in the Phelps Dodge case, supra, wherein it was pointed out and the reasons disclosed why the court should deduct the value of the property assessed by the county assessor from the value of the mine and plant considered as a unit, and it was pointed out and demonstrated why present worth of the salvage value of the personal property should be added to the present worth of the future profits to be taken from the mine for the tax year in question in arriving at the full cash value of a producing mine for taxation purposes. From the only evidence that was produced the trial court was left with no alternative but to find that the full cash value of the mine and plant together, considered as a unit, was the sum of $306,386.03, which under the judgment is the ad valorem value upon which the company paid taxes.

The correctness of the judgment is also challenged upon the ground that the court was in error in allowing the sum of $129,664.80 to be charged as a cost of production where said sum was proposed to be expended for development work, and only crediting new ore as an asset for taxation purposes of the value of $16,970. The state, relying on the rule set forth in State Tax Commission v. Magma Copper Co., supra, and State Tax Comm. v. Eagle-Picher Mining & Smelting Co., 71 Ariz. 290, 226 P.2d 555, insists that in fixing the value of a producing mine for tax valuation purposes where a deduction from the value of the existing ore of the mine for development of future ore has been allowed, there must be an allowance for such future ore at least equal to the cost of such development work.

The valuation engineers and the trial court estimated the ore reserves as of August 1, 1949 consisted of 46,980 tons of commercial ore with a sale value of $1,349,735.40 This ore was classified as "positive ore" and "probable ore" depending upon whether it had been cut and was measurable on three sides, in the case of the positive ore or only on two sides in the case of probable ore, of the block or cube in the process of the development work which had already been performed. The 46,980 tons of ore in reserve was said to consist of 30,010 tons of positive ore and 16,970 tons of probable ore. Briefly, it is the state's position that it is unreasonable and contrary to the rules heretofore established for the court to allow an expenditure of approximately $130,000 for development

and charge the same against the cost of production of ore and allow a credit against this charge of only 16,970 tons of probable ore with a net value of approximately $16,000. The foregoing contention has its origin in the following fact situation: The evidence before the court disclosed that the ore bodies in this mine are not found in compact masses such as in veins or lodes but rather are found as replacements in limestone formations scattered irregularly like "raisins in a pudding". "There didn't seem to be much rhyme or reason to the disposition of these ore bodies." The evidence was that this condition required extensive and expensive development necessitating an unusual amount of drifts and subdrifts, raises and winzes. The principal production was coming from the 420, 500, and 580-foot levels with some minor production on the 340-foot level.

The trial court following the testimony of the engineers found the sale value of the 46,980 tons of ore to be $28.73 per dry ton to be produced at a cost of $27.77 per dry ton leaving a net profit of 96¢ per dry ton. Included in the dry ton cost of $27.77 per ton was an item of 41¢ per ton for exploration and an additional item of $2.76 per ton for development. The development cost claimed and allowed was made up of the following three items: Diamond drilling 36¢; raises 89¢; drifts and crosscuts $1.51. With reference to this claimed charge of $2.76 for development, one of the engineers was interrogated as follows:

"Q. Did I understand you to mean by 'development' work done for the purpose of developing new ore? A. It is for the development of new ore and for ingress or egress toward the ore bodies.

"Q. In other words, it is working facilities to the ore bodies? A. Yes.

"Q. Working facilities to the ore bodies or prospective ore bodies? A. Both."

Further examination of the witness led to the following statement: "The term 'development' is the dead work necessary to open up ore or ore bodies for extraction by lateral, vertical or any other means of opening to get into the ore body so it can be mined out."

It appears to us that the state is confusing the terms "exploration" and "development" and in adding the 41¢ per ton exploration cost to the $2.76 per ton development cost to reach a combined figure of $3.17 per ton and assuming $148,926.80 for "exploratory work" to discover 16,970 tons of probable ore worth approximately $16,000. We make this observation in view of the testimony of the engineer, Mr. Walker, to this effect: "A. Mr. Ling, maybe we are talking about different ores. We spoke about the positive ore and the probable ore and put it all in the ore estimate of 46,980 tons; that being the case, this amount of money that is being spent on the 46,980 tons rather than segregating out the 16,000 tons."

Apparently the trial court was satisfied with this explanation. It is also made to appear from the evidence that during the

first seven months of the year there was mined 46,308 tons and that the ore reserves as of August 6, 1949 exceeded those of January 1st. The engineers also estimated that the ore reserves as of August 6, 1949, would be completely exhausted by the end of the year (1949) unless there was a continuing process of development which had continued through the first seven months and which the engineers testified was necessary in order to keep an ore reserve ahead of the actual extraction. This appears to be reasonably necessary when it is taken into consideration that the operators expected and hoped to be in production after the then known ore reserves had been extracted.

 It is our understanding that the terms "development" and "exploration", although sometimes confused in common speech, are not synonymous. We have gathered from the evidence in this case that "exploration" refers solely to an effort to find additional tonnage and consists almost exclusively of diamond drilling and sampling; whereas, "development" refers to the steps necessarily taken to reach the ore in a mine so that it can be mined and consists of running drifts, crosscuts and raises through the ore zone with some diamond drilling. It is also made to appear that development work as herein defined is not synonymous with "extraction". The engineers in this case allowed for extraction $9.89 a ton and the items allowed for development were in addition to the extraction costs.

In our case of State Tax Commission v. Magma Copper Co., supra, it was pointed out that in order to determine the value of a mine, it was essential to discover the cost of production which was properly chargeable against the gross value of the product. In this case the court referred to the cost of extraction, reduction and selling of the product without differentiating between "development" costs and "extraction" costs but recognizing that *all the factors of cost* had to be considered before the net value of the product could be determined and then conceding that the net profit must first be reduced to its present worth. In that case a charge was made for development work. In referring thereto, the court said: "If, however, by 'development' costs is meant in reality the work reasonably necessary in order to extract the ore, either proved or probable, *for which allowance has already been made in estimating the gross value of the mine*, such work is a legitimate charge against such gross valuation." [41 Ariz. 97, 15 P.2d 963.]

In the Magma case the state contended that the trial court had allowed a charge of some $4,000,000 for exploration costs against ore proved and probable without allowing for the ore which might reasonably be expected to be developed by such work on the contention that all the ore calculated by the experts as representing the gross value of the mine was located above the 3,000-foot level while much, if not most, of the allowed charge was for development work to be done below that

level and was not necessary to extract the ore credited as the gross value of the mine. In view of the fact that the evidence was not sufficiently clear on this point, the judgment was reversed and the case remanded with instructions to retry the issue as to the proper amount to be charged against the gross value of the mine "for exploration or development costs". The court pointed out that it must affirmatively appear that the allowed charge of $4,100,000 for development costs was necessary for the extraction and reduction of the ore credited on the gross value of the mines and that no portion of said $4,100,000 was used for purely exploration work when no allowance was made for the reasonable prospect of finding future ore of a value in a like or greater amount. In the instant case, the engineers testified that the allowance made for development work was absolutely necessary to get at the ores, positive and probable, before they could be extracted. It also affirmatively appears in the judgment that these ores, positive and probable, for which the development allowance was made *had been considered and allowance made for them in estimating the gross value of the mine.*

The judgment is affirmed.

UDALL, C. J., and STANFORD, J., concur.

PHELPS, Justice (dissenting).

I dissent. I quite agree with the premise assumed by the majority that a body of ore, however rich in mineral content may

be, may be of little or no value when so located that it is not accessible to mining equipment or to a processing plant. And I agree with the converse that the mining equipment or processing plant is likewise of little value except when it is capable of being used for mining and processing of ores and to that extent their proximity and availability for use of each by the other is a proper matter for consideration in arriving at their assessed valuation for taxing purposes.

It is the application of the above principle by the majority opinion to which I object. In my humble judgment the majority opinion has gone beyond the realm of reason and reduces the principle to what appears to me to be an absurdity. To illustrate. Let us use the figures incorporated in the majority opinion upon which its conclusion is reached. At the time of the trial in this case on October 14, 1949, and a long time prior thereto the 46,308 tons designated therein in column 1 as "mined" ore had been previously reduced to cash, resulting in a net profit to appellee in the sum of $235,868.64 which it then had in its possession. The remaining 46,980 tons designated as "reserve" was estimated to have a net cash value of $45,100.80 (whether this latter tonnage had then been reduced to cash the record does not show), making a total of $280,969.44. Appellee then availed itself of the discounts allowed in what is known in mining circles as the Hoskold table to estimate the present cash value of the $280,969.44. The result reached

was a present net value of the ore mined and in place, at the time of trial amounting to the sum of $260,158.03. This amount is only approximately $25,000 in excess of the cash then in its possession as a result of the conversion of a portion of the ore into cash.

The county assessor had previously and within the time prescribed by law, fixed the assessed value of the plant located upon the property at $146,405. No appeal was taken by appellee from that assessment. It was therefore final and binding upon everyone including appellee. The superior court therefore was wholly without jurisdiction to consider, review, or to change such assessment. Its jurisdiction was limited to a determination of the value of the mine itself as distinguished from the plant. Notwithstanding its lack of jurisdiction it did, in effect, reduce the assessed value of the plant from $146,405.00 to $46,228. It accepted testimony of witnesses for the appellee that the plant had only a junk value of $46,228. It then added this amount to the $260,158.03 and for some reason wholly beyond my power to comprehend, deducted the $146,405.00 from the total leaving a net value of the mine of $159,981.03. This result is reached notwithstanding the fact that the undisputed evidence was to the effect that appellee then had in its possession $235,868.64 cash constituting the net profit derived from the mined tonnage of ore shown in the majority opinion in column 1 of its table. In addition to this, it had $45,100.80 estimated profits from the remaining tonnage in reserve. By the majority opinion this court is holding that $235,868.64 actual cash in hand plus $45,100.60 worth of ore in reserve has a value of only $159,981.03 for taxing purposes. This method of computation and accounting is not in accord with any mathematical calculation with which I am familiar and has no support from the courts of any other state.

As a further illustration of its unsoundness let us assume that the plant here involved and assessed at $146,405.00 by the county assessor had been owned by John Doe and the mine by appellee during the year 1949. Could it then be contended that the assessor's valuation of the plant must be deducted from the assessed value of the mine itself. The answer is emphatically "no". How can the union of ownership in the mine and the plant alter the value of each for tax purposes? The answer is, it cannot. In my opinion the most that appellee is entitled to claim as a deduction from its net profits of $260,158.03 (largely reduced to cash) is the reasonable depreciation of the plant caused by its use in mining and processing ore taken from the mine during the year 1949. If plant depreciation was not considered in arriving at the net profits of $235,868.64 for the ore that has been converted into cash as well as the estimated net value of the ore in reserve, I dare say appellee stands alone among the industries of America in failing to avail itself of that legal right.

The assessment of the mine by the Tax Commission finds no support in the records

of this case. It was clearly unjustified. It is equally clear to me that the assessed valuation of the mine and plant fixed by the court and sustained by the majority opinion is contrary to the law as established in the cases heretofore decided by this court on the subject and cited by the majority opinion. I think the majority has misinterpreted the language used in those cases.

Without discussing the other question raised, suffice it to say that I concur with Justice DE CONCINI in the views expressed in his dissenting opinion to the effect that the deduction of the development work in the sum of $148,926.60 in arriving at the assessed value of the mine is in direct conflict with the rule laid down in the previous Eagle Picher case decided in 1951, and should not have been allowed.

DE CONCINI, Justice (dissenting).

I add my dissent to that of Mr. Justice PHELPS. I dissent on the following grounds:

The majority opinion 1) disregards res judicata and our statutes; 2) is guilty of judicial legislation; 3) condones double taxation; 4) ignores stare decisis re: "Development" costs.

I will use the terms, "court" in referring to the majority opinion; the "state" in referring to appellant; the "company" in referring to the appellee.

Res Judicata and Judicial Legislation.

The following sections of 1939 A.C.A. are pertinent:

Sections 73–106 empowers the tax commission to assess producing mines.

Section 73–202 provides real estate shall be assessed separately from improvements. Real estate includes patented mines.

Section 73–402 empowers county assessors to assess all property except as otherwise required by the State Tax Commission.

According to law the county assessor assessed the company's improvements and personal property in the sum of $146,405. The company failed to object to the assessment as provided by law to the board of supervisors sitting as a board of equalization in June and again in July of that year. Section 73–419 provides the method of appeal from the county board of equalization. The company accepted the assessment of the county assessor and the matter became final and is therefore res judicata.

The company appealed under section 73–110 which provides for an appeal from the state board of equalization which allows the parties to adduce evidence tending to establish "full cash value of the property in question". The company's evidence proved that the value of the ore which was reduced to cash and was on hand as cash, was ........................ $235,868.64
Estimated profits on ore reserves 45,100.80

Total ............... 280,969.44

The company's contention is that the above figure less Hoskold's discounts and less the assessed value of the plant and equipment plus the salvage value of the plant and equipment, is the true value of

the mine. By such calculation we arrive at the following:

Total value of cash and ore on hand less Hoskold discounts 260,158.03
Less value of plant.......... 146,405.00

Actual value of cash and ore.. 113,753.03
Plus salvage value of plant.... 46,228.00

Total value of cash and ore (i. e. mine) .................. 159,981.03
Plus value of equipment....... 146,405.00

Total value, both mine and plant 306,386.03

Such maneuvering amounts to the substitution of the salvage value in place of the assessed value of the plant and personal property, and no amount of argument or explanation can change that simple statement.

By approving such a method of evaluating the mine and plant the court has substituted its own formula in place of what is prescribed by law and therefore the court has disregarded the statutes and is guilty of judicial legislation.

The province of the trial court was to find the value of the ore and cash on hand, and not consider the value of the plant which value was accepted and not appealed from and therefore settled. In order to consider the two values together the statutes should be changed by taking the assessment power away from the county assessor and confer it upon the tax commission. Thereby the commission could consider the value of the plant in with the mine. Then upon appeal from the tax com-

mission assessment, the trial court could consider the value of both mine and plant together as it has in this case. However, by so doing it in the instant case it has disregarded the statutes.

### Double Taxation

Paradoxically, the method contended for by the mining company amounts to double taxation. This procedure, contrary to section 73–201 which says "Nothing herein shall be construed to require or permit double taxation" is condoned by this court. Such "double taxation" is contended for by the mining company because by substituting one value for another it actually gives them a tax advantage. To illustrate:

The ore value was found to be $260,158.03 which included the value of the plant (According to the court)
In order to find value of ore deduct ................... 146,405.00

Actual value of the ore on hand 113,753.03

Therefore by paying the county treasurer the taxes on the plant, they admit its value and the legality of the tax thereon.
With the value of the cash and ore on hand worth......... 113,753.02
the mining company says, and this court agrees with it, that now we have reduced it too much and therefore we should add the salvage value of the plant in the sum of .......... 46,228.00

Total value of cash and ore on hand .............. 159,981.03

Counsel for the mining company in their argument before the court indicated that $5,000 or $10,000 is more nearly the true salvage value of the plant but agreed that the figure of $46,228.00 looked better than the true salvage value. No matter what amount was added, whether it be $5,000 or $50,000, it should not have been added because the mining company already paid the tax on the value of the plant, to wit, $146,-405.00, and to add any part of that value to the mine amounts to double taxation, which is contrary to law.

## Stare Decisis

The court relies on the former decisions of this court in upholding the trial court, to wit: State Tax Commission v. United Verde Extension Mining Co., 39 Ariz. 136, 4 P.2d 395; State Tax Commission v. Magma Copper Co., 41 Ariz. 97, 15 P.2d 961; and State Tax Commission v. Phelps Dodge Corporation, 62 Ariz. 320, 157 P.2d 693, 694.

An examination of the first two cases will reveal that the question of the substitution of the salvage value of the plant in the place of the assessor's value was not raised on appeal and was not decided in those cases. The matter was directly raised by assignment of error in the Phelps Dodge case but was never answered by the court except in its statement before it reached the question of assignments of error. In its statement it merely said: " * * * It was made to appear from their testimony that the plant, mill, and personal property were of no value, except for salvage purposes, without the mine, and likewise that the mine was of no value without the plant, mill, and personal property. To find the 'full cash value' of the mine, as distinct from the plant, mill, and personal property, requires that the amount fixed by the County Assessor, to-wit $3,109,079, as the assessed valuation of the plant, mill, and personal property, be subtracted from the individual estimates of the engineers to arrive at the valuation placed on the mine alone by any particular valuation engineer. * * * "

The mining company has cited no authority from other jurisdictions where such a formula is approved, neither has it cited any recognized mining authorities, except during argument counsel referred to mining engineers Hoover and Finlay. An examination of Principles of Mining by Herbert C. Hoover (1909) and the Economics of Mining by Theodore Jesse Hoover (1933) does not reveal any such formula as contended for by the mining companies. The work of Finlay was not available for examination.

The following articles on the "Formulas for Mine Valuation" taken from Mining Scientific Press: June 29, 1918, p. 882; December 27, 1919, p. 925; August 21, 1920, p. 270; November 23, 1918, p. 682; May 24, 1913, p. 766; May 18, 1918, p. 213, reveal no such formula.

Apparently Arizona is unique in its method of evaluating producing mines!

The state also assigns as error the fact that the undisputed evidence presented by

the company shows that for the last five months of 1949, there was allowed for development work a charge of $129,664.80 against a net profit from the ore bearing that burden of at most $45,100.80. Actually the amount spent for development work was $3.17 per ton on the reserve ore of 46,980 tons or a total of $148,926.60.

The court concludes that this was an allowable deduction from the gross valuation of the ore. To reach this result, they rely on certain language found in State Tax Commission v. Magma Copper Co., supra [41 Ariz. 97, 15 P.2d 963]: "If, however, by 'development' costs is meant in reality the work reasonably necessary in order to extract the ore, either proved or probable, *for which allowance has already been made in estimating the gross value of the mine,* such work is a legitimate charge against such gross valuation."

The majority say:

"It appears to us that the state is confusing the terms 'exploration' and 'development' * * *". and "It is our understanding that the terms 'development' and 'exploration', although sometimes confused in common speech, are not synonomous. * * *" 241 P.2d 808.

In the recent case of State Tax Comm. v. Eagle-Picher Mining & Smelting Co., 71 Ariz. 290, 226 P.2d 555, 557, decided by this court on January 15, 1951, the same mining company was seeking to allow a charge for *development* costs of $74,271.00 where but $10,000 (Net Profit) was to be credited for tax purposes. In that case, we held after considering the Magma Copper Co. case, and the supposed distinctions, that:

"According to the language used in the Magma Copper Co. case, supra, a mining company is *only* justified in deducting money, to be spent for development purposes, from the assessed valuation of the mine, where it is shown that the ore to be developed is of a greater value than the amount spent for the development of that ore, and this ore value then added to the valuation of the mine.

"In this case, it appears that the trial court found that the net value of the ore to be developed from the expenditure was $10,000.00, whereas in any event, if a deduction is allowed, as was the case here, the value of the ore to be developed must arbitrarily be fixed at a sum not less than the allowed deduction, to wit: $74,271.00, and this figure added to the value of the mine. Of course, if the value of the ore to be developed, exceeded the allowed deduction then such value would be added to the value of the mine."

Had the majority opinion considered the recent Eagle Picher case, supra, it would be impossible to sustain the mining company's contention. Apparently, the Eagle Picher case, supra, is overruled by the court in the instant case, based on the language in the Magma Copper Co. case, which the Eagle Picher case, supra, was supposed to clarify.

If we were to follow the latest Eagle Picher case, then any amount the mining company spends for "exploration and development" and deducts such amount as costs from its gross income, then such amount shall be added to the valuation of the mine even though such "exploration and development" didn't result in the discovery of any new ores. Such a holding is reasonable and correct. That sum ($148,-926.60) should be deducted from "cost of production and marketing" and will therefore increase "estimated profit on ore reserves" to $194,027.40.

The following tables are presented for comparison—Table I as presented by the mining company; Table II as I think it should be, which shows a gross valuation of mine and plant in the sum of $561,929.43.

| | TABLE I<br>As Presented | | TABLE II<br>Should Be | |
|---|---|---|---|---|
| | Mined<br>46,308 Tons | Reserve<br>46,980 Tons | Mined<br>46,308 Tons | Reserve<br>46,980 Tons |
| Estimated value ore reserves | $1,613,531.64 | $1,349,735.40 | $1,613,531.64 | $1,349,735.40 |
| Less cost of Production and marketing | 1,377,663.00 | 1,304,634.60 | 1,377,663.00 | *1,155,708.00 |
| Estimated profit on ore reserves | 235,868.64 | 45,100.80 | 235,868.64 | 194,027.40 |
| Total profit ore reserves | | 280,969.44 | | 429,896.04 |
| Discount future Profits to cash value (using Hoskold Table) .92593 | | 260,158.03 | | **415,524.43 |
| Scrap value of plant @ $50,000. with 4% disct. for 2 yrs. to reduce to cash value 0.92456 | | 46,228.00 | | None *** |
| Total cash value mine & Equip. | | 306,386.03 | | ..... |
| Less assessed value of personal property | | 146,405.00 | | |
| Value of mining property | | 159,981.03 | | |
| Plus assessed value of personal property | | | | 146,405.00 |
| Value of mining property | | | | $ 561,929.43 |

 \* Development costs of reserve ore amounting to 3.17 per ton deducted from cost of production and marketing.
 \*\* Hoskold Table used on reserve ore only as mined ore value has been received.
 \*\*\* Salvage value not applicable as no information showing total value of personal property has not been recovered through cost of production and marketing.