579 P.2d 1075

**MOHAVE COUNTY, a body politic; Mohave County Treasurer; and Arizona Department of Revenue, Appellants,**

v.

**DUVAL CORPORATION, a corporation, Appellee.**

No. 13068.

Supreme Court of Arizona, In Banc.

April 10, 1978.

Rehearing Denied May 9, 1978.

Bruce E. Babbitt, former Atty. Gen., by James D. Winter, Donald P. Roelke, Mary Z. Chandler, Asst. Attys. Gen., Phoenix, for appellants.

Bilby, Shoenhair, Warnock & Dolph by Michael Lacagnina, David A. Paige, Tucson, for appellee.

STRUCKMEYER, Vice Chief Justice.

This appeal focuses on the ad valorem assessment practices of the Arizona Department of Revenue in the mining industry. Pursuant to A.R.S. §§ 42–146, 42–151 and 42–152, appellee, Duval Corporation, sought a refund of ad valorem property taxes assessed against its Mineral Park Mine near Kingman in Mohave County, Arizona for the year 1975. On appeal to the State Board of Tax Appeals, the value was fixed as $35,000,000. On further appeal to the Superior Court, that value was found to be

excessive. The court made an independent determination that the full cash value was $14,300,000. We hold the valuation as fixed by the Board of Tax Appeals was not excessive. The judgment of the Superior Court is reversed and the valuation of appellee's Mineral Park Mine as fixed by the Board of Tax Appeals is affirmed.

■ At the outset, certain principles should be emphasized. We have held:

"It is clear that before the superior court may change the valuation it must first find that the valuation of the assessing authority is excessive." *Graham County v. Graham County Electric Coop., Inc.,* 109 Ariz. 468, 470, 512 P.2d 11, 13 (1973).

and

" * * * in order to overturn the valuation fixed by the taxing authority there must be a finding—substantiated by competent evidence—that such valuation was 'excessive.' " *Navajo County v. Four Corners Pipe Line Company,* 107 Ariz. 296, 298, 486 P.2d 778, 780 (1971).

In *Navajo County v. Four Corners Pipe Line Company,* 106 Ariz. 511, 522, 479 P.2d 174, 185 (1970), we quoted with approval this language:

" 'It is generally recognized that a taxpayer is not entitled to relief * * * simply because the value of his property would be fixed substantially lower if computed by a different method even if the court thought such method to be preferable to the one adopted by the taxing authority. * * * ' *State Board of T. Comm'rs v. Chicago M., St. P. & Pac. R. Co.,* 121 Ind.App. 302, 96 N.E.2d 279, 283."

By statute A.R.S. § 42–201, 4, for property tax purposes "market value" and "full cash value" are synonymous and mean:

" * * * that estimate of value that is derived annually by the use of standard appraisal methods and techniques."

The trial court, in rejecting the State's valuation, found:

" * * * the court considered all the evidence but put little or no weight on the State's appraisals because of the inap-

propriate method used." (Finding No. 12)

The dispositive question, then, is whether the State's appraisal was inappropriate as not having been derived through the use of standard appraisal methods and techniques.

■ There are three accepted approaches to estimating value: (1) the reproduction cost of the property, (2) income projected into the future (capitalization of income), and (3) market data appraisal which is the comparison of sales of similar property. *Navajo County v. Four Corners Pipe Line Company,* 106 Ariz. 511, 479 P.2d 174 (1970). The State's method of appraisal is a form of capitalization of income. Appraisal by capitalization of income is "an approved appraisal method." *Graham County v. Graham County Electric Co-op., Inc.,* 109 Ariz. 468, 471, 512 P.2d 11, 14 (1973). James Bonbright, in his treatise on the Valuation of Property, Volume 1 at page 230, makes this observation:

"The 'capitalized-income method' of valuation refers to any procedure whereby the appraiser measures the value of the property by a calculation or estimate of the income or services derived or derivable from the property by its present or potential owner. In its more usual form, it involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale."

In fixing the value of the Mineral Park Mine, the State did not estimate the mine's net income for 1975 by estimating its probable gross revenues and deducting the estimated probable cost of production. Rather, the State averaged the net income received from the last five years of the mine's operation and after comparing past years of operation with the mine's probable operations in 1975 concluded that a projection of the average rate of income over the remaining life of the mine would fairly represent its net earnings for 1975. For the year 1974, the Mineral Park net earnings were $6,666,-243; for 1973, $7,334,851; for 1972, $5,707,-403; for 1971, $6,475,039; for 1970, $9,485,-660; a five-year average of $7,133,839. The

life of the Mineral Park Mine at the then current rates of production was estimated as approximately ten years, with leaching operations extending its life five years more at reduced earnings. We note that under the Superior Court's determination of value of $14,300,000, unless economic conditions radically changed from the preceding years, Duval's shareholders would recover the entire value of the mine in the two-year period 1975 and 1976.

Roland Parks, in his work, "Examination and Valuation of Mineral Property," discusses extensively the Michigan mining appraisal system. In Michigan, a five-year average of income has been used to estimate the value of copper mines since 1924.

"The industrial and economic conditions under which the mines have operated have changed time and time again during the past quarter of a century, but throughout all this period the fundamental principles used in the valuation of mines in Michigan for tax purposes have not been altered. This would indicate that these principles are sound, and for that reason they are of interest to anyone studying the appraisal of mines.

*    *    *    *    *    *

It is logical to expect that past records of production, cost of mining, and profits will give some clue to future production, cost of mining, and profits. In the Michigan appraisal, all this background is gone over carefully, especially for the five years preceding the appraisal. This is a long enough period so that the average result usually gives a representative picture of the condition of the mine. A longer average would often cover phases of the history that are not representative of what may be expected in the future.

*    *    *    *    *    *

* * * In Michigan a five-year period was decided upon as a fair measure of past performance. The experience in this State shows that five years is not too long and only infrequently too short." R. Parks, Examination and Valuation of Mineral Property, 448–455 (4th ed.).

Examination of past earnings is an appropriate means of determining future earning ability. As the Supreme Court of California said:

"Earnings data for the past several years is useful and used to assist an appraiser in projecting and determining future net income and earning ability, and is needed and used to determine a trend and help avoid error which could be caused from examining a short, possibly abnormal, period." *California Portland Cement v. State Bd. of Equalization,* 67 Cal.2d 578, 582, 63 Cal.Rptr. 5, 8, 432 P.2d 700, 704 (1967).

■ We think it is plain that the examination of net income of past years, modified where necessary by consideration of probable changes in economic conditions, is a recognized, standard appraisal technique by which full cash value may be fairly determined.

■ Duval's position is that "the State mechanically used the average of the previous five years' profits at Mineral Park", meaning that the State did not consider the differences in the mine's future operations to determine its earning ability. But we do not think so.

The testimony in the Superior Court established that Duval's 1974 shareholders' report contained this statement:

"No material adverse changes in the nature of the ore reserves being mined by Duval or in the general mining conditions at Duval's mines which would tend significantly to affect mining costs have occurred or are anticipated."

The State did not, however, rely solely on Duval's statement that no adverse changes in mining costs were anticipated. The State's appraiser, Donald E. Ross, examined the Mineral Park Mine in February of 1975. He investigated virtually every phase of the operation of the mine as to what was to be expected in the future. He testified concerning a discussion with the mine superintendent and geologist:

"Q. Did you have a conversation with the mine superintendent regarding the conditions or the operations at the mine?

A. Yes, I did.

Q. What was related to you in that conversation?

A. He related to me that ore reserves had increased; that the grade was decreasing; the stripping ration [sic] was increasing. He indicated several areas of molybdenum content that had been abandoned in the past. This type of thing.

Q. Did you have a conversation with the geologist?

A. Yes, I did.

Q. What was related to you in that conversation?

A. Essentially, we discussed ore reserves; the increases in the ore reserves; changes in grade, stripping ratio; and so forth, and we looked at some cross sections, a few bench plans to determine what could be expected in the future."

and:

"The mill superintendent indicated that they have had problems with the mill in the past; in other words, this mill was designed to be an autoganous mill. Autoganous grinding, essentially the rock grinds itself. They have converted the mill to a ball mill in which they add iron balls, and this grinds the rock. This has caused problems in the past. These problems for the most part have been resolved and they can be expected to be eliminated in the future."

Ross further testified:

Q. Utilizing this approach, how did you go about placing a value on this mine?

A. Well, first we examined the production data and determined what changes had occurred in the period in the prior five years; in fact, actually we looked at the prior seven years. We recognized the changes that had occurred with grades; the stripping ratio changes; and so forth; and so on. We examined the cost structure. Then we tried—the

basis of establishing a value is hinged on establishing a reasonable margin of cash flow for the future. We looked over all this information, and we used a five year sample. We felt that the past five years was a representative sample of the cash flows to be projected in the future because it contained both good and lean years. Then we established the cash flow and the margin. This was plugged into the Hoskold formula[1] and the Morkill formula, discounted to present worth, which would be the full cash value.

\* \* \* \* \* \*

Q. Mr. Ross, what was the calculation that you went through? Basically, how did you determine the cash flow that you utilized in the figures, and describe how you obtained them.

A. First, we would examine the revenues. We examined the evidence that supports those revenues; in other words, the recovery; the amount of copper contained; the amount of copper that they can get out in dollars; how much revenue can be expected from this operation. We recognized, of course, that this is not a copper mine in the strict sense of the word. Copper is its main product, but molybdenum and silver and turquoise are very important by-products in this operation, so that although the costs indicate extremely high costs for copper operation, they have to be considered in the light that these costs also include the costs of by-products. When you talk about an 81¢ cost, that is not strictly for copper. That cost includes everything. So that on the other side of the coin there is more to the revenue side of the picture because there is copper, molybdenum, silver and turquoise, and so forth. We examined all this data. We recognized that the grade for the last three years, four years, the grade has been decreasing at Mineral Park. In 1971 the grade was 5

1. In *State Tax Commission v. Eagle Picher Mining & Smelt Co.*, 73 Ariz. 372, 241 P.2d 804 (1952), this Court affirmed a valuation in which the Hoskold formula was used to derive the value of the mining company's property. For

an analysis of capitalization of future net profits, see Note, *Property Taxation of the Mining Industry in Arizona*, 12 Ariz.L.Rev. 763, 780 (1970).

tenths. In 1974 the grade was [.36]. That is a decrease of 14 one-hundredths in grade. But yet, as illustrated in the graph, the margin has increased. The grade has decreased but the margin has increased. * * *

\*       \*       \*       \*       \*       \*

Q. What reasoning or analysis did you go through before you actually got down to using figures and calculating a cash flow?

A. We examined the, as I said, we examined the revenues and costs and the interplay of the two. We examined what effect the different variables had on costs; what effect the different variables had on revenues. We examined the past seven years. We examined last year and the last five years. We looked at information from the stockholders' report. All this data was then summarized to determine what the cash flow would be. We realized the fact that we dictated the 62¢ price per pound for copper; however, we also realized as shown by that graph, Exhibit C, that if you use this method, the cash flow would be distorted, and we could not comply with our statutory duties, and that is to determine the full cash value. So that if the cash flow is distorted, then it has to be corrected, and under the direction of Mr. Hathaway, that was corrected. He directed that we use the five years' historical average of the margins as an indicator of what could be expected as future cash flows for the operation. Then we had to weigh that against what variables will affect the future. In essence, that is what we did.

\*       \*       \*       \*       \*       \*

Q. What was the actual calculation by which you determined the dollar amount of this cash flow that you were predicting, trying to obtain?

A. First we had to determine what sample would indicate what the mine is capable of doing in the future. That is the basic question: What is this mine

capable of doing in the future in terms of dollars? In some mines a five year period is used, and some mines some other period of time was used, but in this particular case we felt that a five year period could be used because we felt it was a representative sample including both good and lean years, and, so, we averaged a five year margin and examined that margin against the pounds of copper that could be produced, expected in the future, ores that could be expected in the future; the increase in moly or the decrease in moly and so forth. We felt it was our opinion that, in fact, the five year average margin was a reasonable figure, and this was computed on the Hoskold and Morkill basis.

\*       \*       \*       \*       \*       \*

Q. What was the basis for using this income approach that you utilized in valuing this mine for 1975?

A. Mineral Park is an established mine with an established performance record. Of course, as you can see, the value of this mine is determined by the cash flow. Once you establish the cash flow, you can determine the value of the operation. The question you constantly ask yourself is: What is reasonable? What is a reasonable cash flow for this operation? In this case we looked at the history to try to predict what could be anticipated in the future. The mine is operated in the range of $9 and one-half million and $5 and a half million, as illustrated in the actual data in Exhibit D. Of course, we heard the argument about using past profits. We are not using past profits. We are looking to the future. We have tried to determine what the future income stream will be. That is the only reasoning for examining the past. So, we examined the past five years. The past five year average was somewhere around $7 million and we felt this was a reasonable cash flow for the future." [2]

2.  John Buehler, an economist and head of the Economics Department at the University of Arizona, testified:

"Q. Historical data is employed in forecasting, isn't it?
    A. Oh, all the time.

Duval does not argue that erroneous assumptions were made by the State in testing the future cash flow against the past. Nor was the projection forward of past earnings into the future, examined in the light of the State's approach, criticized by any of Duval's witnesses. Duval simply argues that the Department of Revenue's use of the historical data technique is "in violation of Arizona law" and "contrary to Arizona law," relying on this statement from *State Tax Commission v. Magma Copper Co.*, 41 Ariz. 97, 99, 15 P.2d 961, 962 (1932):

"There are eight assignments of error, but the question raised by all eight is in effect the sufficiency of the evidence to

Q. And why is it used in forecasting?
A. Because in most cases there is no other alternative, so, essentially what is being done is to take the historical data, determine if it is representative of what is going on in the present and try to determine if it may well be representative over of what may be expected to occur in the future. Then one would test that historical data against some other basic theoretical principle. For example, if one were going to predict a price of an industrial commodity, one would want to know the uses of that industrial commodity over a time and would want to forecast the consumption or demand for those products that are going to use that industrial commodity. I know of no other way of really going at it. In the case of what the Department of Revenue did, was to take a five year average in the past. There is some justification for that on economic grounds because it is consistent with the theory of efficient market. If you take an industrial commodity that is produced over a period of time, that industrial commodity will have to generate sufficient profit over a period of time such that it generates a normal rate of return to the investment capital to maintain a normal flow of investment capital into the industry and maintain the industry as a viable force in the economy. If for some reason or the other price should rise very dramatically with respect to costs for that particular commodity, then you would have abnormal profit for a period of time, and an abnormal rate of return, and that could not be sustained over a long period of time because investment capital would readily flow into that industry to take advantage of the abnormally high profits, ultimately driving the price down such that the profits ultimately that would be generated would be back in line with the profit or the rate of return of other alternative industries. Similarly, if for some reason or the

sustain the judgment, and we therefore consider them as one. The trial court in fixing the value of the mine in question followed the usual and correct rule of estimating the probable gross revenue to be received from the ore presumably contained in the mine; deducting therefrom the probable cost of extraction, reduction, and selling the product of the ore, including therein all factors of cost, and reducing the difference, which would be the net value of the product, to its present worth, based upon such net value and the length of time it would probably take to produce it. It is conceded, as it must be, that this formula is the proper one to be

other price was depressed for a very short period of time, profits would fall and the rate of return would fall dramatically, and capital would be withheld from moving into that industry. After all, investment capital has many, many alternatives, and if the rate of return were very low and the capital would not flow into that industry, production would be constrained somewhat and as demand continues to rise over a time, the price would rise very dramatically with it probably much faster than the historical trend, until the rate of return that has been normal over a long period of time has returned to that industry. If you are going to try to predict for a specific year what the price is going to be and what the profit is going to be and the rate of return is going to be, that is a foolish job because in any one year there is no reason that the economics of the situation has to be enslaved to a twelve month calendar. In any one year, anything can happen, and it takes time for the adjustment in profits to occur. If you are going to look over a long period of time, say a decade, then one can reasonably assume that the rate of return, say, the copper industry or any other industry, is going to be roughly commensurate with the rate of return of all other industries. That is the American production process. That is if the product, in this case copper, is going to continue to be used in the American industrial process. I think it will be.
Q. Are you familiar with the literature in regard to forecasting?
A. Yes, I am.
Q. And what literature supports the use of historical data in forecasting?
A. Every economic journal that I am familiar with. The whole field of econometrics, which is the sophisticated technique of forecasting is built on economic models based upon utilization of historical data."

used in determining the actual cash value for taxation of a producing mine at any particular time."

If we assume that this Court in 1932 intended to say that this was the exclusive way to assess producing copper mines, the legislative definition enacted in 1968 that "full cash value for property tax purposes * * * means that estimate of value that is derived annually by the use of standard appraisal methods and techniques," A.R.S. § 42–201, supra, is the controlling law and *Magma Copper* is not precedent against the use of historical data to forecast future income. Anything which may be considered as inconsistent with the views expressed in this opinion arising out of the language used in *State Tax Commission v. Phelps Dodge Corp.,* 62 Ariz. 320, 157 P.2d 693 (1945), if such exists, is expressly overruled.

We said in *Navajo County v. Four Corners Pipe Line Company,* 106 Ariz. 511, 479 P.2d 174 (1970), that a trial court in reviewing the action of the Board of Tax Appeals may superimpose its opinion only in the event that the State agency abused its legislatively-delegated duty. And we pointed out that a taxpayer is not entitled to relief because the value of his property would be fixed substantially lower if computed by a different method, even if the court thought such method to be preferable. Duval Corporation did not establish that the State abused its legislatively-delegated duty, nor. did it point out by competent evidence wherein the assessment was legally excessive. Since the court may not fix the value of property at a substantially lower amount even though the court thinks the taxpayer's method is preferable to the one adopted by the taxing authority and courts will not give relief against an assessment on account of mere differences of opinion, the judgment of the Superior Court is reversed and the valuation as fixed by the Board of Tax Appeals is affirmed.

Judgment reversed.

HAYS and HOLOHAN, JJ., and HENRY S. STEVENS, Court of Appeals Judge, Retired, concur.

CAMERON, Chief Justice, dissenting.

I dissent.

Note: GORDON, J., did not participate in the determination of this matter. HENRY S. STEVENS, Court of Appeals Judge, Retired, was called to sit in his stead.