892 P.2d 1340

**BUSINESS REALTY OF ARIZONA, INC., a corporation, Plaintiff–Appellee,**

v.

**MARICOPA COUNTY, a political subdivision of the State of Arizona, Defendant–Appellant.**

**No. CV–93–0374–PR.**

Supreme Court of Arizona,
En Banc.

April 4, 1995.

**552**

Fennemore Craig, P.C. by Paul J. Mooney, Kendis K. Muscheid, and Donald P. Roelke, Phoenix, for Business Realty of Arizona.

Helm & Kyle, Ltd. by John D. Helm, Roberta S. Livesay, Ileen K. Keenan, Tempe, for Maricopa County.

## OPINION

FELDMAN, Chief Justice.

Maricopa County (the county) petitioned this court to review a court of appeals opin-ion affirming a tax court judgment in favor of Business Realty of Arizona (taxpayer). We first granted review on one issue only: whether the court of appeals had improperly interpreted A.R.S. § 42–147. We later granted review on an issue we had originally declined: whether the court of appeals' inter-pretation of that statute rendered it void for vagueness. . These issues have statewide im-portance because they directly affect other cases and the government's critical ability to tax. We have jurisdiction under Ariz. Const. art. 6, § 5(3) and A.R.S. § 12–102.

## FACTS AND PROCEDURE

Taxpayer owns Camelview Plaza Shopping Center in Scottsdale. This major shopping center (the property) encompasses over 426,-000 square feet of improvements, including department stores, many smaller retail ten-ants, a movie theater, and two large parking structures. This appeal arises from the county's 1990 valuation of the property for real property taxation.

Using the cost approach to valuation, the county assessor originally valued the proper-ty at $26,301,328. Taxpayer protested this valuation and demanded that the county in-stead employ the straight line building resid-ual (SLBR) method of A.R.S. § 42–147(B).[1] Using this method, the Maricopa County Board of Equalization (board), the initial re-viewing body, reduced the property's as-sessed full cash value to $18,475,184. Still displeased, taxpayer appealed to the tax

---

1. "An appraiser using the [SLBR] technique as-sumes that land or site value can be estimated independently [usually by the comparable sale approach to estimating market value]. The ap-praiser applies the land capitalization rate to the known land value to obtain the amount of annual net income needed to support the land value. Then this amount is deducted from the net oper-ating income to derive the residual income avail-able to support the investment in the building(s). Finally, the land value and the building value are added to derive an indication of total property value.... The technique is simple, but its appli-cability and usefulness are extremely limited." APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 473–74 (10th ed. 1992). The SLBR "technique is liable to serious error if applied to older build-ings because of the nature of the deduction for depreciation. The older the building the greater the possible error." AMERICAN INSTITUTE OF REAL ESTATE APPRAISERS, THE APPRAISAL OF REAL ESTATE 288 (5th ed. 1967).

The SLBR technique is really a mathematical procedure in which the appraiser uses a formula for "certain known factors to find the un-knowns.... In [this] technique, the known or assumed factors are net income [after operating expenses] before recapture, land value, interest rate, and the useful life of the building. The unknown factor is the building['s market] val-ue.... The general purpose of [this technique] is to estimate the [market] value of a property when the ... building['s] value [is] unknown and cannot otherwise be estimated separately on a reasonable and convincing basis." *Id.* at 289.

court under A.R.S. § 42–245(A)(1).[2] That court reduced the assessed value to $12,896,-672.

From this judgment, the county appealed. Although disagreeing in part with the tax court's analysis, the court of appeals affirmed the judgment. *Business Realty of Arizona, Inc. v. Maricopa County,* 178 Ariz. 29, 870 P.2d 1125 (Ct.App.1993). The county then petitioned this court for review. The key issues in this appeal are relatively simple and hinge on the interpretation of Arizona's idiosyncratic statutes on the valuation of shopping center property. We begin with legislative policy and the relevant constitutional provisions and statutes. We agree with the court of appeals that the statutes at issue are poorly worded, but conclude that a reasonable analysis of their text and historical context make the legislative intent quite clear. *See id.* at 36, 870 P.2d at 1132.

Arizona's historic approach to tax valuation has been to require assessment of property at fair market value. *See, e.g.,* Rev.Stat. Ariz., Civil Code § 4849 (1913); A.R.S. § 42–201(4). In the present case, therefore, we look for indications that the legislature wanted to have shopping center property, as defined by A.R.S. § 42–147(F)(2), assessed at anything other than the fair market value that our legislature has traditionally regarded as the fundamental basis for tax assessment.

## VALUE AND FAIR MARKET VALUE

### A. Value in Arizona tax assessment

█ For tax purposes, Arizona values all property at full cash value. A.R.S. § 42–221(B). In Arizona and nationally, full cash value generally means fair market value. *See, e.g., Supervisor of Assessments v. Har Sinai West Corp.,* 95 Md.App. 631, 622 A.2d 786, 794 (Md.Ct.Spec.App.1993), BLACK'S LAW DICTIONARY 597–98 (6th ed. 1990). Until 1989, the definition section of the Arizona tax statutes explicitly defined "full cash value" for property taxation as "synonymous with

market value." A.R.S. § 42–201(4). That continued an Arizona tradition dating at least to 1913, when the first state legislature decreed:

> All taxable property must be assessed at its full cash value. The term "full cash value" ... means the price at which property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property is usually sold, and not the price which might be realized if such property was sold at a forced sale.

Rev.Stat.Ariz., Civil Code § 4849 (1913); *see also* Rev.Code Ariz. § 3068 (1928) (same); Ariz.Code § 73–203 (1939) (same); *Bank of Arizona v. Howe,* 293 F. 600, 609 (D.Ariz. 1923) ("It will be seen by the Constitution and laws of the state that ... all taxable property within the state must be assessed at its full cash value."); *Federal Land Bank v. County of Yuma,* 42 Ariz. 45, 48, 22 P.2d 405, 406 (1933) ("The law requires that all property be assessed at its full cash value.").

In 1989, the legislature tempered the full cash value premise by amending the general tax definitions. A.R.S. § 42–201(4); 1989 Ariz.Sess.Laws ch. 259, § 1. After the 1989 amendment, "full cash value" for property tax purposes meant "that value determined as prescribed by statute. If no statutory method is prescribed, full cash value is synonymous with market value." § 42–201(4). It is important to note that this 1989 law specifically identified and reaffirmed the general traditional approach using market value as the standard goal for tax valuation.

### B. Defining and finding fair market value

█ Fair market value is, of course, that "amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." BLACK'S LAW DICTIONARY at 597; *see also* APPRAISAL INSTITUTE, THE APPRAISAL OF REAL ESTATE 18–22 (10th ed. 1992). For tax purposes, fair

---

**2.** Now A.R.S. § 42–245(A). The statutory scheme in effect in 1990 allowed taxpayers to appeal to the tax court at any point in the administrative appeal process by filing a notice of appeal on or before November 1. A.R.S. § 42–245(A)(1) (version in effect July 1, 1986 to September 1, 1990).

market value is determined by use of three common appraisal approaches: capitalizing the income stream, estimating replacement cost less depreciation, and estimating market value by comparable sales. § 42–221(E).[3] The Arizona Legislature has rarely used its power to prescribe an alternative to the fair market value concept of full cash value for tax valuation purposes.[4]

## C. Shopping center tax valuation

The basic tax classifications for Arizona property appear in § 42–162(A). Shopping centers are class 3 property, generally defined as "all real ... property ... devoted to any commercial or industrial use...." § 42–162(A)(3)(a).

Taxpayer's entire argument turns on a claim that the legislature has somehow created special tax value for shopping centers in § 42–147, which prescribes the valuation system for shopping centers. In relevant part, § 42–147 states:

A. The valuation of a shopping center shall be determined by ... utilizing the replacement cost less depreciation method, except as provided in subsections B and C of this section....

B. Upon a review or appeal, at the election of a taxpayer, the income method commonly known as the straight line building residual method shall be used in the valuation of a shopping center, subject to the provision of subsection D, if the taxpayer submits all reasonably necessary income and expense information. The reviewing body shall utilize the information submitted by the taxpayer and may also utilize any other information customarily analyzed under this method. [Specific capitalization and recapture rates omitted.]

C. Upon election by a taxpayer, a property may be valued by the method prescribed by subsection B of this section....

D. Upon appeal of a valuation determined by the income method or an appeal where the taxpayer has elected the income method pursuant to subsection B, *if after computing the value by the income method the reviewing body finds that other valuation factors must be applied to determine the value of the property it may utilize such other factors as it finds necessary;* provided that it shall specify in its written order what other factors were considered, the manner in which they were applied, and the change in the final value, if any, resulting from the use of such other factors....

(Emphasis added.)

A shopping center, to which the quoted sections apply, is defined by § 42–147(F)(2) as:

[A]n area comprised of three or more commercial establishments, the purpose of which is primarily retail sales, which has a combined gross leasable area of at least twenty-seven thousand square feet, owned or managed as a unit and one or more of the establishments having a gross leasable area of at least ten thousand square feet.

## TRIAL COURT AND COURT OF APPEALS ANALYSES

When first valuing the property, the county assessor used the replacement cost less depreciation method required by § 42–147(A). On appeal to the board, taxpayer chose to have the property valued under the SLBR method, as allowed by § 42–147(B). Although the board reduced the property's value by $6 million, taxpayer appealed that valuation to the tax court. Because of its generic language, it is impossible to determine the appeal's exact basis.[5] However, it

---

**3.** *See also* Jennifer J.S. Brooks & Donald J. Schultz, *Market Theory: An Approach to Real Property Valuation for State and Local Tax Purposes,* 45 TAX LAW. 339, 339–40 (1993); *Mohave County v. Duval Corp.,* 119 Ariz. 105, 579 P.2d 1075 (1978).

**4.** For some examples, see A.R.S. § 42–144.02 (utility companies); § 42–144.01 (pipelines); §§ 42–227.01 through 42–227.04 (mines); § 42–147.01 (livestock); and § 42–146 (golf courses).

We note that the tax court recently struck down the golf course statute on the grounds that it was unconstitutionally vague. *Kabuto v. Maricopa County,* 178 Ariz. 392, 873 P.2d 1314 (1994).

**5.** In the appeal, taxpayer used broad pro forma language covering as many theories for relief as possible, claiming that the "full cash and limited valuations and classifications for these parcels are or may be excessive, arbitrary, nonuniform, and illegal because standard and statutory ap-

appears that taxpayer claimed the board incorrectly considered information or theories outside the SLBR method in valuing the property. By weighing those other factors, the board supposedly reached a higher valuation than it would have using only the SLBR method.

The trial court agreed with taxpayer, finding that the SLBR method must be used "absent extraordinary circumstances such as those which might exist if one or more of the [SLBR] factors ... could not be determined." The trial court ruled that when, as in this case, no such circumstances exist, subsection (D) did not apply. The trial court acknowledged that by not considering other valuation factors, the court's estimate of the property's value was much lower than the board's, and valued the property at just under $13 million. In reaching this decision, the trial judge conceded that the valuation he reached did not represent the property's value under the market value test similar to the one first formulated by the Arizona Legislature in 1913. Rev.Stat.Ariz., Civil Code § 4849 (1913). *See ante* at 553–54, 892 P.2d at 1342–43.

The court of appeals disagreed with the trial court's interpretation of § 42–147(D). It held that application of subsection (D), permitting use on appeal of other valuation factors, is not restricted to situations in which one or more of the SLBR components could not be determined. *Business Realty,* 178 Ariz. at 35, 870 P.2d at 1131. It held, rather, that even if all numbers necessary to compute the SLBR method are provided, subsection (D) may still apply to rebut the prima facie value arrived at through use of the subsection (B) variation of the income approach. *Id.* at 34, 870 P.2d at 1129. Nonetheless, the court of appeals could not ascertain when or what other valuation factors could be used to rebut the value derived through use of the SLBR income technique. *Id.* at 36, 870 P.2d at 1132.

The court of appeals did determine what other valuation factors *could not* be used. Affirming the trial court's valuation, the court held that "other valuation factors," which § 42–147(B) permitted a reviewing body to consider, did not include market value estimates derived from comparable sales or from market adjustments to the capitalization rate prescribed in § 42–147(B). *Id.* at 35, 870 P.2d at 1131. Although the court of appeals could not define the other valuation factors permitted by subsection (D),[6] it held that a complete definition was unnecessary because, for appellate purposes, it needed only to determine what the statute excluded from consideration. *Id.* at 36, 870 P.2d at 1132.

We do not believe it possible to construe the statute and determine either what it *excludes* or *includes* without first understanding what it means. If the court of appeals erred in its construction of the statute, and that statute can be rationally interpreted, then the void for vagueness issue and other constitutional questions are irrelevant. We turn first, therefore, to the statute.

## STATUTORY INTERPRETATION

### A. Interpreting the text of A.R.S. § 42–147

■ The parties' arguments are uncomplicated. The county argues that subsection (D) gives the reviewing body the power to use any and all relevant information to determine the property's *market value,* including data and other commonly-accepted methods of valuation not provided for in the statutory and non-statutory variables used to estimate value by the SLBR approach.

Taxpayer contends that, despite subsection (D)'s evident ambiguity, the statute is clear on its face that the reviewing body *shall* use either the cost less depreciation approach or the SLBR method of the income approach,

---

praisal methods and techniques were not properly applied, because such methods and techniques were arbitrarily and illegally applied and/or because such methods and techniques resulted in full cash value and limited valuations for the subject parcels which are nonuniform, excessive, inequitable and illegal."

6. "[W]e are unable to determine what the legislature meant by the language 'other valuation factors' in subsection (D), and the taxpayers have not provided us with any workable alternative[.]" *Id.* at 36, 870 P.2d at 1132.

solely at the taxpayer's election. Specifically, taxpayer claims that the statute fails to mention, and thus has explicitly excluded, any reference to market value derived from market data or other factors. Therefore they cannot be considered under any circumstances. This exclusion, taxpayer argues, is allowable under § 42–201(4), which now says that full cash value can be prescribed by statute and market value is relevant only if no statutory method is prescribed. We believe taxpayer bases this argument on the erroneous assumption that § 42–147 requires a restricted method of valuation that excludes the concept of fair market value and blinds a reviewing body to relevant factors and appraisal techniques available to determine a shopping center's fair market value.

We do not agree that the legislature intended the statute to accomplish that result. Nor does the text so direct. The law first instructs the assessor to use the replacement cost less depreciation approach to determine a shopping center's value. See § 42–147(A). Under this approach, the assessor applies a recognized appraisal technique to determine first the *market value* of the land and then to add the value of the improvements at replacement cost less a reasonable depreciation. See A.R.S. §§ 42–221(E) and 42–201(4); Appraisal of Real Estate, at 318–19. The use of this cost approach is, of course, one route to finding *market value*. *Id.* at 20–21, 180–81.

If the statute stopped there, it would have indeed prescribed an exclusive method to determine the property's full cash value. But subsection (B) gives the taxpayer the option on appeal of electing to use the SLBR income approach for estimating value. If the statute had stopped at this point, the legislature would have prescribed an exclusive alternate approach of determining full cash value on review. Again, however, the income approach is *not* a substitute for market value but only a method of estimating it. *Id.* at 18–20, 259–77. Thus, mandating use of the SLBR approach is not a prescription for a value concept different from market value, only a requirement that a particular technique for estimating market value be applied

at the board's review stage of the appraisal process.

The statute goes on to make the result of the SLBR income approach "subject to the provisions of subsection D." § 42–147(B). Subsection (D) tells us that if, after computing value under the income approach invoked by the taxpayer under subsection (B), the "reviewing body" finds that "other valuation factors must be applied to determine value," they may be utilized "as necessary." § 42–147(D). The statute thus prescribes nothing except the use of one method of estimating market value by the assessor and, on appeal by the taxpayer, the invocation of another technique for determining value, with the use of other factors on final review, if necessary to determine value. Obviously, then, the use of the term "value" in subsection (D) refers to some estimate of value derived from a process going beyond the cost and income methods prescribed in subsections (A) and (B).

Textually, therefore, the meaning of the phrase "other valuation factors," which subsection (D) allows the reviewing body to consider, is necessarily determined by the meaning of "value" as used in that subsection. The "factors" relevant to determining value cannot be identified until we know what "value" means as used in subsection (D). Again, it must mean something different from the replacement cost and income approach estimates of value derived from subsections (A) and (B). Otherwise, subsection (D) would have no meaning.

The simplest and best explanation is that "value" in subsection (D)'s phrase "value of the property" means the property's *final* fair market value for tax purposes. Other uses of "value" in this statute refer to the *preliminary* fair market value determined by intermediate methods. Of course, that preliminary value would be the *final* fair market value if the appeal process was neither invoked nor carried forward. The buck stops at subsection (D). Once the final reviewing body estimates the property's fair market value under subsection (D), the process ends and the property's final assessed value for taxation purposes is fixed.

Thus, although we acknowledge that the text is unclear, we disagree with the court of appeals' conclusion and taxpayer's contention that the shopping center statute should be construed to mean that relevant market and income approach information cannot be considered when valuing shopping centers. Such a conclusion would render subsection (D) meaningless or at best vague. It would compel the reviewing body or court to accept the estimates of fair market value derived under subsection (B), even though that result is expressly subject to subsection (D). Moreover, it would blind the reviewer to other valuation factors that could fix the property's market value far more accurately than the SLBR method might in any particular case.

The reason for establishing such a procedure is not hard to infer. For lack of sales, shopping center property may be difficult to value. Further, valuation of real property, whether done for taxation or investment purposes, is not subject to mathematical certainty. As another court once cogently observed:

> The appraisal of real estate is an art, not a science. There are various methods of approach in determining the market value of real estate, each approach involving the use of various guidelines. Although the use of such guidelines may be mandatory in appraisal work, their application to various situations calls upon the exercise of judgment.

*Powell v. Kelly,* 223 So.2d 305, 309 (Fla. 1969).

Thus, A.R.S. § 42–147 specifies two initial approaches to the valuation process: replacement cost less depreciation and SLBR variation of the income approach. The reproduction cost less depreciation approach of § 42–147(A) is one of the three common methods of determining market value. *See* §§ 42–221(E) (mentioning three approaches—cost, income, and market data) and 42–201(4) ("market value . . . is derived annually by the use of standard appraisal methods and tech-

niques"). As § 42–147(B) itself indicates,[7] the SLBR technique is simply a variation of the income approach. *See also* APPRAISAL OF REAL ESTATE, at 421. The third approach to estimating market value utilizes market information (comparable sales) as the indicator. *Id.* at 60, 63–65. All three methods rely to some extent on market forces and all are simply standard techniques used to find market value. § 42–201(4); Jennifer J.S. Brooks & Donald J. Schultz, *Market Theory: An Approach to Real Property Valuation for State and Local Tax Purposes,* 45 Tax Law. 339, 343 (1993). These techniques are not values but ways to estimate value. A conscientious and competent appraiser will consider all approaches and information, applying an informed judgment to make the final estimate of market value. APPRAISAL OF REAL ESTATE (5th ed.), at 2–6.

We believe, then, that the text of the statute does not ignore market concept and theory when determining the value of shopping centers. Instead, it specifies a sequence for using recognized techniques to estimate fair market value in tax assessment. If the legislature intended otherwise, lawmakers would have chosen a valuation method that completely disregarded market value and specified the formula to be followed, instead of allowing the reviewing body to estimate the final value when "necessary" by use of "other valuation factors." *Cf.* § 42–144.01 (special valuation system for pipeline companies); § 42–144.02 (special valuation method for gas and electric utility district property); *see also ante* n. 4; *post* n. 10. We believe, therefore, that "value" in § 42–147(D) means market value and the phrase "other valuation factors" refers to other information used when necessary to estimate fair market value.

**B. Legislative intent**

The dissent argues, we believe incorrectly, that the legislature could but did not enact "a statute requiring shopping center property to be valued at fair market value using whichev-

---

7. In relevant part, A.R.S. § 42–147(B) states:
   Upon a review or appeal, at the election of a taxpayer, *the income method commonly known as the straight line building residual method shall be used in the valuation of a shopping*

   *center,* subject to the provision of subsection D, if the taxpayer submits all reasonably necessary income and expense information.
   (Emphasis added.)

er of the three generally accepted methods best achieves it." Dissent at 562, 892 P.2d at 1351. But that is exactly what the legislature did. In using the word "value" in the statute, the legislature provided that shopping center properties—like almost all other Arizona properties—should be assessed at fair market value, which, as will be seen, is what the word "value" meant when the statute was enacted.

Our construction of the statute is strongly supported by reference to *expressed* legislative intent and goals, our most reliable tools in construing a statute. *Canon School Dist. No. 50 v. W.E.S. Constr. Co.,* 177 Ariz. 526, 529, 869 P.2d 500, 503 (1994). This court has properly been skeptical of some approaches to divining legislative intent. *See Hayes v. Continental Ins. Co.,* 178 Ariz. 264, 269, 872 P.2d 668, 673 (1994). However, in this case we need not divine or speculate about legislative intent and goals because when the legislature adopted § 42–147 in 1982, it carefully provided a statement of legislative findings. 1982 Ariz.Sess.Laws ch. 232, § 1. This statement, when read with existing legislation, shows that the legislature wanted market value to determine the assessment of Arizona shopping centers.

In excluding the concept of market value, both the tax court and the court of appeals relied on the 1989 amended definition of "full cash value" in § 42–201(4). The court of appeals quoted this statute, emphasizing "full cash value ... is that value determined as prescribed by statute," and then stated, "[i]n 1982, the legislature adopted section 42–147 as the statutory method to determine the full cash value of shopping centers." *Business Realty,* 178 Ariz. at 32, 870 P.2d at 1128.

Contrary to taxpayer's position, however, when § 42–147 was adopted, it was not intended to prescribe a concept of full cash value different from or exclusive of fair market value. When the shopping center statute was passed in 1982, *full cash value was defined only as market value. See* A.R.S.

§ 42–201(4), version in effect in 1982.[8] This reinforces our conclusion that § 42–147 did not prescribe a value different from market value, only a procedure to find market value. It was not until seven years after the shopping center statute was passed that the general definition of "full cash value" in § 42–201(4) was amended to provide that full cash value was market value unless some different method of determining value was prescribed by statute. Even if that change in the general definitional section of the chapter could change the meaning of different statutes passed seven years earlier, it could not alter the specific intent expressed by the legislature in its 1982 findings when § 42–147 was adopted.

In 1982, the legislature explicitly found "that it is necessary to *improve techniques for determining the full cash value [then synonymous with market value] of shopping centers* because of the absence of sales of shopping centers in this state." 1982 Ariz. Sess.Laws ch. 232, § 1 (emphasis added). Because, at the time the legislature made that finding, full cash value meant only market value, the legislature clearly concluded that the lack of comparable sales for large shopping centers made it appropriate to specify the sequence and method of applying appraisal techniques to estimate the *market value* of shopping centers. The legislature sought to improve the system of determining the market value of shopping centers—not to create a special concept of value for shopping centers. The value to be determined was still fair market value, the only meaning of full cash value at that time and the one that the legislature has followed since Arizona became a state.

The wording of the 1982 legislative findings further indicates that it was not the legislature's purpose to force a particular concept of value on the review process. The legislature expressed its concern that assessors were using different variables each time

---

8. In 1982, A.R.S. § 42–201(4) provided: " 'Full cash value' for property tax purposes is synonymous with market value which means that estimate of value that is derived annually by the use of standard appraisal methods and techniques or as provided by law. Full cash value shall be

used as the basis for the purpose of assessing, fixing, determining and levying secondary property taxes." Of course, the market approach was one of the "standard appraisal ... techniques" referred to in this statute.

they valued shopping centers, leading to non-uniform valuation. This is indicated by the legislative finding that "stability and equality in valuation of shopping centers can be achieved by prescribing the application of uniform cost, depreciation and obsolescence factors ... and uniform capitalization rates." 1982 Ariz.Sess.Laws ch. 232, § 1.

Thus the legislature's expressed intent in adopting § 42–147 in 1982 was to prescribe a sequence of techniques to determine the fair market value of shopping centers, with the proviso that if on further review the agency or court found it "necessary" to determine the shopping center's "value," it could consider "other valuation factors." § 42–147(D). The "value" that subsection (D) referred to could only be market value, because the only meaning of full cash value at the time was fair market value.[9]

Further, contrary to the dissent's argument, every step specified in the statute is actually an approach for estimating fair market value. Subsection (A) uses the replacement cost approach, and subsection (B) uses a variation of the income approach. Both techniques estimate fair market value. In our view, therefore, subsection (D) permits the final reviewing bodies to consider those approaches and, if they find it necessary, all other relevant information and standard appraisal techniques available for the best estimate of fair market value. This interpretation is the one most compatible with the text, the expressed legislative intent, and common sense.

The legislature has not amended § 42–147. All that has changed is that in 1989 the legislature amended the general definition section (§ 42–201) to provide that full cash value means market value unless the legislature has prescribed some other value by statute. Subsection (4). The legislature did not, however, indicate any different intent for fixing value of shopping centers and did not change § 42–147 to prescribe some different value concept for shopping centers. Unlike other properties for which the legislature has prescribed valuation systems excluding the concept of market value from full cash value, no reason appears and none is advanced why

the legislature would have wanted to change the system so that some, but not all, retail stores are valued at less than market value, however that concept is derived. Interpreting § 42–147 in accord with the legislature's expressed intent and goals, the statute does no more than specify the procedure to determine full cash value within the concept of market value. It does not establish a different concept of value for some shopping centers as distinguished from other shopping centers and other class three retail and commercial property.

Both constitutional considerations and public policy strongly support this interpretation of the statute.

## C. Constitutional considerations

■ We interpret statutes to uphold their constitutionality, if that is possible. *Arizona Dep't of Revenue v. Trico Elec. Coop., Inc.,* 151 Ariz. 544, 548, 729 P.2d 898, 902 (1986); *Mardian Constr. Co. v. Superior Court,* 113 Ariz. 489, 493, 557 P.2d 526, 530 (1976). As a corollary, we strive to give statutes meanings that avoid serious constitutional issues. We reach those only when absolutely necessary. *See Petolicchio v. Santa Cruz County Fair & Rodeo Ass'n,* 177 Ariz. 256, 259, 866 P.2d 1342, 1345 (1994). This is another way of saying that we presume the legislature recognizes the restrictions imposed on it by our state constitution and tries to abide by that constitution when it drafts laws.

■ Although the designation of separate classes of property for special treatment is a legislative function, *In re America West Airlines, Inc.,* 179 Ariz. 528, 534, 880 P.2d 1074, 1080 (1994), the Arizona Constitution requires that all taxes be uniform on all property in a particular class. Ariz. Const. art. 9, § 1. In this case the legislature has *not* created a separate, extraordinary tax classification for shopping centers. Under our construction, § 42–147 merely outlines a procedure for estimating market value for certain types of shopping centers. Because the statute requires that shopping centers be valued, like all other class 3 property, at market

---

**9.** A.R.S. § 42–221(B) (1982 version).

value, we are not required to examine our constitutional provision guaranteeing uniformity of taxation on all properties in the same class. *Cf. In re America West*, 179 Ariz. at 534, 880 P.2d at 1080.

In tax matters, we presume that the objective of the legislature in setting special valuation *methods* for certain properties is to aid in estimating a reasonable fair market value for all properties, thus keeping the tax burden equal. If the legislature's intent is to prevent the valuing body from considering fair market value, as taxpayer argues in this case, then we believe it would accomplish that result explicitly and unambiguously, as it has, for good reason, with properties for which there is ordinarily no market. *See Hayes*, 178 Ariz. at 273, 872 P.2d at 677.

We cannot envision, and the record discloses no reason, why the legislature would have offered owners of shopping center property the unique tax treatment afforded owners of such peculiar property as mines, utilities, and pipelines, for which there is, practically speaking, little or no market at all and which therefore require the use of convoluted mathematical formulae just to make a reasonable estimate of their value for taxation purposes. *See ante* n. 4. A good example is the pipeline valuation statute.[10] This complex statute, and sections such as the one dealing with utility valuation, stand in stark contrast to the one we deal with here, which, after all, does no more than specify the order in which to apply well-known standards and techniques that appraisers routinely employ ·to determine the fair market value of property such as shopping centers.

Thus, our difference with the dissent is small but important: the dissent would interpret the statute to limit the relevant information and techniques that the reviewing body can use to estimate fair market value, while we believe the legislature intended to give

the final reviewing body the opportunity to consider all relevant information and apply all recognized techniques to arrive at the best possible estimate of fair market value. This, after all, is the interpretation that is most sensible and fairest for both the owner and other taxpayers.

We do not consider the issue in this case to be which of the three approaches to valuation is best for determining the value of shopping centers. Our interpretation of the statute hinges on the legislature's express intent to assess shopping center properties, like all other class three commercial property, at fair market value. Given that the legislature's intent in adopting the statute was to ensure assessment at fair market value, the most sensible interpretation construes the term "other valuation factors" to give the final assessing authority access to *all* of the standard approaches and techniques necessary to reach and verify the most accurate assessment of fair market value.

The dissent relies on the proposition that the comparable sales method does not apply to shopping centers. Dissent at 563, 892 P.2d at 1352, citing Homer Hoytt, *Appraisal of Shopping Centers*, ENCYCLOPEDIA OF REAL ESTATE APPRAISING 411 (Edith J. Friedman, ed., 1968); *see also* Homer Hoytt, *Appraisal of Shopping Centers*, ENCYCLOPEDIA OF REAL ESTATE APPRAISING 444 (Edith J. Friedman, gen. ed., 3d ed. 1978). Although this author believes that "valuation of a shopping center cannot *ordinarily* be based on comparison with sales of commercial properties in the vicinity," he appears to concede that market value remains the goal when appraising even a shopping center. *Id.* at 411, 420 (1968 ed.) (emphasis added).

We have no quarrel with the idea that the income approach may be the best indicator of market value. *Grossman v. Westmoreland II Investors*, 123 Ariz. 223, 224, 599 P.2d 179,

10. To determine the valuation of a pipeline, the department of revenue must: (1) determine its base value (defined approximately as net book value); (2) calculate the value change factor, (3) multiply these values to calculate the preliminary system value, except that if the value change factor does not apply, the preliminary system value is the system net book value of the plant in service as of December 31 immediately preced-

ing the current tax year, (4) add the value of construction work in progress, materials and supplies, non-capitalized leased operating property, and gas stored underground to the preliminary system value, (5) calculate the allocation factor, and then (6) multiply this sum times the value obtained after completion of step (4). A.R.S. § 42–144.01(F).

180 (1979) (Also stating that "[a]ll real property in the State of Arizona is required to be valued at 'full cash value' or its 'market value.'") (citations omitted).[11] But shopping centers now crowd the landscape. One consequence is a growth in usable comparable sales of retail centers. Thus, well-informed and experienced appraisal authorities recognize that, when appraising shopping centers, the "sales comparison approach ... can be a vital check against the value derived through use of the income capitalization approach." William J. Kimball, *Recent Trends in the Shopping Center Market*, 45 APPRAISAL J. 382, 389 (July 1991). Indeed, competent and conscientious appraisers of shopping centers know that "[t]ypically the income approach to value is most significant, although the cost and market approaches are appropriate checks." James H. Burton, *Reviewing the Shopping Center Appraisal*, APPRAISAL REV. & MORTGAGE UNDERWRITING J. 38, 38 (Spring 1992).

The view advanced by the taxpayer, the court of appeals and the dissent would keep the vital check of comparable sales from a reviewing body. Even more important, their interpretation of the statute would force a reviewing body to ignore fair market value and even disregard a recent sale of the very shopping center whose assessment is on appeal. For example, suppose the shopping center in this case had sold for $50 million the day before the tax assessor appraised it, but, as the tax court concluded, the SLBR method produced a valuation of only $12,896,672. A competent appraiser would unquestionably want to know about the recent sale, "examine the differences in the conclusions derived from the various [appraisal] approaches, apply tests of reasonableness to these primary conclusions, and resolve any inconsistencies." APPRAISAL OF REAL ESTATE, at 553. The restrictive interpretation given the statute by the trial court, the court of appeals and the dissent, however, would bar the reviewing body from considering the recent sale of the very property being valued, despite the unmistakable relevance of this information to fair market value. As the trial judge concluded, the result he reached

by application of the restrictive test was "substantially below" the fair market value of the property. We do not believe the legislature intended such a result.

## CONCLUSION

A.R.S. § 42–147 establishes a property valuation system designed to estimate fair market value. It was intended to bring uniformity to a difficult process by first requiring an estimate of fair market value through the reproduction cost approach, then, if the owner was dissatisfied, by a variation of the income approach to fair market value. Then, on appeal, the statute allows the reviewing body to consider all facts and techniques recognized by the appraisal profession in determining fair market value. Thus, if the SLBR technique provides a figure that falls within the range of reasonable market values, it should be upheld on final review. However, if, as may be the situation in the present case, the value estimate from use of the SLBR income method produces a figure not reasonably within the range of market value indicated by the facts, the final reviewing body may use all other relevant information and standard techniques of valuation to determine fair market value. § 42–147(D).

This result applies the statute in a way providing uniform taxation for all commercial property and retail stores in class 3. This is the most reasonable interpretation of the law because it furthers the stated legislative goal and provides a sound constitutional basis for the law.

On this record, of course, and as a court of review, there is no way we can determine the value of the property. The tax court, following the statutory procedure in estimating value and applying the prescribed methods, will have to determine the property's market value. We therefore reverse the tax court's judgment, vacate the court of appeals' opinion, and remand to the tax court for further proceedings consistent with this opinion.

MOELLER, V.C.J., and CORCORAN, J., concur.

11. *But see ante* n. 1 for defects in the SLBR technique.

ZLAKET, Justice, specially concurring.

The majority and the dissent may not be as far apart as they first appear. Like the dissent, I cannot ignore that while the statute makes specific reference to the income and the cost-less-depreciation methods of evaluation, it says nothing about the comparable sales approach. Furthermore, the legislature seems to deliberately have recognized a distinction between "methods" to be used and "factors" to be considered. Therefore, I lean initially toward the construction placed on the statute by the dissent.

I do not, however, perceive that this interpretation prevents relevant market data from being included in the "other factors" to be weighed under A.R.S. § 42–147(D). Even those authorities cited by the dissent acknowledge that market components such as trends in local and national activity, changes in construction costs and financing, and *"economic supply and demand in the real estate market for the type of property under appraisement,"* are important to any meaningful shopping center appraisal. 892 P.2d at 1353 (emphasis added). Consideration of these factors, along with additional items referred to in the dissenting opinion, would seem to be consistent with sound appraisal principles. Indeed, as the dissent notes, "a market survey must be prepared" even under an income approach, of which the SLBR is but one variation. 892 P.2d at 1353. Thus, while the traditional comparable sales method of appraisal may be considered by some experts as inapplicable to the evaluation of shopping centers, and even assuming *arguendo* that this explains why the method was not specifically designated by the statute, it does not necessarily follow that identifiable market indicators are useless when the income method is the required approach.

Moreover, the disagreement here seems largely illusory. It is difficult to understand how evidence of other sales could ever be considered if, as the dissent claims, experts do not accept it as having significance in the appraisal of shopping centers. There would never be an adequate foundation for its admission. Even if erroneously allowed, this proof would likely carry little weight, assuming it has such slight relevance. If, however, other sales are recognized as market factors that deserve consideration, no logical reason has been shown why the legislature would not want evidence of them included in the final analysis of value.

I agree with the majority that fair market value is the ultimate goal of each and every appraisal method that has been discussed. I also concur that the statute, when adopted, sought to provide an analytical framework for reaching fair market value and should still be construed with that end in mind. Nothing in this record persuades me that shopping centers are entitled to be taxed on any other basis, and I would have serious constitutional concerns were it otherwise.

MARTONE, Justice, dissenting.

The theory developed by the majority to solve this interesting issue is unsupported by the text and structure of the underlying statute. By defining "value" as "market value," the majority defines away the very issue this case presents for resolution. But the statute is not that simple. If the legislature had wanted to achieve the result the majority reaches here, it could simply have enacted a statute requiring shopping center property to be valued at fair market value using whichever of the three generally accepted methods best achieves it. But A.R.S. § 42–147 sets up an elaborate mechanism by which shopping center property is valued.

Section 42–147(A) requires the county assessor to use the replacement cost less depreciation method to value shopping center property, unless the taxpayer elects the income method. Thus, in all cases in which the taxpayer chooses not to elect the income method, all shopping center property in Arizona will be evaluated by the replacement cost less depreciation method. And this is true whether that method produces fair market value or not. As long as there is no appeal, and no election by the taxpayer to use the income method, the mechanism stops at the replacement cost less depreciation method. The majority's theory fails to account for this. It claims that fair market value is the *sine qua non* of the valuation of shopping center property, but under its theo-

ry, a reviewing body can only look at fair market value in the event there is an appeal under the income method.

Now, if the taxpayer elects the income method under the authority of § 42–147(C), the assessor may use that method *ab initio.* But whether the taxpayer makes that election at that level or not, upon a review or appeal under § 42–147(B), the taxpayer may elect the income method known as the straight line building residual method subject only to the provision of subsection D.

Subsection D provides that upon appeal of a valuation determined by the income method (under subsection C), or an appeal where the taxpayer has elected the income method (under subsection B), "if after computing the value by the income method the reviewing body finds that other valuation *factors* must be applied to determine the value of the property it may utilize such other factors as it finds necessary...." A.R.S. § 42–147(D) (emphasis added). Under the majority's theory, "other valuation factors" means that all bets are off. The reviewing body would not be bound by either the income method or the replacement cost less depreciation method, the only two valuation methods prescribed by the statute. See subsection E(2)(B) ("the two valuation methods"). Under the majority's theory, then, in those rare instances in which the taxpayer chooses the income method and there is an appeal, the only two methods prescribed by § 42–147 may be ignored and the reviewing body is free to determine fair market value in ways it sees fit. But why would the legislature authorize the reviewing body to do this only in that rare class of cases? After all, if the taxpayer does not elect the income method, or if there is no appeal, everyone is stuck with the replacement cost less depreciation method required by subsection A, whether that method produces fair market value or not. I thus believe that the majority's theory is simply unsupported by the structure of the statute.

What then does the reference to "other valuation factors" in subsection D mean? It cannot mean another *method* because the statute uses the word "method" in subsection A with respect to the replacement cost less depreciation method, in subsection B with

the "income method," known as the "straight line building residual method," and the word "method" is used three separate times in subsection D in connection with the "income method." Thus, if the legislature were referring to another "method" it would have simply said so. We first discuss "method" and then "factors."

The generally accepted methods of valuing a shopping center are the "cost replacement method" and the "income approach method." *Grossman v. Westmoreland II Investors,* 123 Ariz. 223, 224, 599 P.2d 179, 180 (1979). The comparable sales method is inapplicable to shopping centers. *Encyclopedia of Real Estate Appraising* 402, 411 (Edith J. Friedman ed., 1968) [hereinafter Friedman 1968]; *Encyclopedia of Real Estate Appraising* 437, 444 (Edith J. Friedman gen. ed., 3d ed., 1978) ("In neighborhood centers, as in regional centers, the Income Approach is the final determinant of value, and the Market Comparison Approach is of limited use.") [hereinafter Friedman 1978]. The 1978 Friedman treatise preceded the enactment of our statute by just four years. And this court, three years before the statute was enacted, acknowledged the inapplicability of the comparable sales method to shopping center property. In determining cash or market value, the court discussed the three methods of assessment.

First is the cost replacement method, that is, the initial value or cost of the property plus appreciation and less depreciation. Second is the market data method, that is, the value as determined from recent sales of comparable properties in the same market. *Because there are not many sales of shopping centers and because of the many differences between shopping center size, age and location, the market value approach is not normally used for this kind of property.* Third is the income approach method determined by the property's net earning power based on the capitalization of the net income.... In Maricopa County, the initial valuation of a new shopping center is done by the cost method. The third method, the income approach, is frequently used after a shopping center has been in operation long enough to make this

method feasible. The information and data necessary to perform an income analysis is solely with the possession of the owner of the shopping center and this information must be provided by the owner to the assessor before the assessor can perform an income analysis and arrive at a market value based upon the income method.... [T]his method can be advantageous for some shopping centers....

*Grossman*, 123 Ariz. at 224, 599 P.2d at 180 (emphasis added). This language foreshadowed that of the statute. Had the legislature wanted to allow the use of the comparable sales method in an unconventional manner, it would have said so.

It is thus plain that our statute is based upon the science of appraisal techniques known at the time of its enactment. The income approach still dominates.[1] See *Gabrellian & Jessourian Assocs. v. Borough of Oakland*, 11 N.J. Tax 310, 315 (1990), which quotes Friedman 1978 and says that "[a]s shopping centers are bought and sold on the basis of their net income, ... the expert's comparable sales are devoid of any probative utility."

If the comparable sales method is not a "factor," then what are "factors?" The answer is to be found in an examination of the income method itself. While subsection B of the statute refers to one of the factors, the capitalization rate, there are many other factors involved in investment property that an appraiser must consider when using the income approach to value. Friedman 1968 at 37; William L. Ventolo, Jr. and Martha R. Williams, *Fundamentals of Real Estate Appraisal* 165 (1990) [hereinafter Ventolo and Williams]; American Institute of Real Estate Appraisers, *The Appraisal of Real Estate* 321 (1978) [hereinafter American Institute]. Under subsections B and C, the taxpayer submits income and expense information. But "[b]efore net income is ready to be processed into an indication of value, the ap-

praiser must consider several important *factors* bearing on value." Friedman 1968 at 40–41 (emphasis added). These are: (1) trends or cyclic swings in international, national, city, and neighborhood activity; (2) decentralization, particularly of a central city business district; (3) rising or falling costs in construction; (4) supply and demand of mortgage financing; (5) economic supply and demand in the real estate market for the type of property under appraisement; (6) the remaining economic life of the property; and (7) the physical condition of the property. *Id.* at 41.

Several other "factors" "affect the appraisal of the shopping center": (1) single ownership of the land; (2) the size of the site; (3) zoning; (4) topography; (5) subsoil conditions; (6) availability of utilities; (7) the level of real estate taxes; (8) distance from competing shopping centers; (9) accessibility; and (10) land cost. Friedman 1968 at 403–405.

And the following factors require "special emphasis": (1) the property must be valued as an aggregate; (2) a market survey must be prepared; (3) *sales of commercial properties in the vicinity cannot be used as a basis of valuation of the center;* and (4) valuation of the land must be based on capitalization of annual residual net income. *Id.* at 405.

"Various national, regional and local *factors* might also have to be analyzed in deriving market rent." Ventolo and Williams at 165 (emphasis added). Are rents going up or down? Are we coming out of a recession or going into one?

There is another sense in which the use of the word "factors" has been part of the historical development of the income approach. Present worth factor tables are referred to as "Inwood factors." "Hoskold factors" are "reciprocals of the building capitalization rate when based upon sinking-fund recapture." American Institute at 316, 318.

---

1. Contrary to the majority's assertion, the inapplicability of the comparable sales approach is not just because of the absence of sales, but also because of the incomparability of those sales. Shopping centers are not similar enough to support the comparable sales method. *Grossman,* 123 Ariz. at 224, 599 P.2d at 180; Friedman 1978 at 444. Too much depends upon a variety of factors such as the presence of competition, the mixture of tenants, the terms of leases, the cost of construction, the terms of mortgages, parking areas, and operating expenses. Friedman 1978 at 444.

The point of this is that the words "other valuation factors" in subsection D can mean any number of factors within the income method. These could include market factors to the extent otherwise allowed by the income method. But unless words are infinitely elastic, "other valuation factors" cannot include the entirely unexpressed comparable sales method.

In sum, I read "other valuation factors" to mean other valuation factors within the income method, and not, as the majority does, as other valuation "methods." This, it seems to me, comports more closely with the structure of § 42–147. It gives meaning to subsection D without destroying the legislature's intent to use the replacement cost less depreciation method or the income method for the valuation of shopping center property.

Finally, the majority develops its theory against the backdrop of constitutional concerns over the unique treatment given shopping center property. I do not share those concerns. "Value" is simply that figure derived by the application of the method selected by the legislature for a particular class of property.[2] The legislature has the power to classify property for taxation purposes in ways that are rational. These appraisal treatises and *Grossman* suggest that the two methods the legislature chose are precisely those that are applicable to shopping center property, and that the comparable sales method is not. Thus, I see no constitutional issues here. I say this because if the legislature is of the view that neither the majority nor I have properly understood § 42–147, it is free to amend it to make its purpose more manifest.

If the comparable sales method ever achieves acceptance in the appraisal community for the valuation of shopping centers, it is the function of the legislature, and not this court, to amend the relevant statute. I respectfully dissent.

---

**2.** And thus the implausible example of paying $50 million for an asset that generates income as though it were worth $13 million does not trouble me. *Ante,* at 561, 892 P.2d at 1350.