27 P.3d 819

**LONDON BRIDGE RESORT, INC., a Delaware corporation; Resort Association, Inc., a corporation, individually and as agent of all its Members, Plaintiffs/Appellants,**

v.

**MOHAVE COUNTY, a political subdivision of the State of Arizona, Defendant/Appellee.**

No. 1 CA–TX 00–0013.

Court of Appeals of Arizona, Division 1, Department T.

July 10, 2001.

Morrill & Aronson, P.L.C. by K. Layne Morrill, John C. Doney, Phoenix, Attorneys for Plaintiffs/Appellants.

William J. Ekstrom, Jr., Mohave County Attorney by Christine L. Nelson, Deputy County Attorney, Deborah L. Herbert, Deputy County Attorney, Kingman, Attorneys for Defendant/Appellee.

## OPINION

RYAN, Judge.

¶ 1 The question we must answer in this appeal is whether Mohave County exceeded its statutory authority in valuing time-share condominium units by considering estimated market values of time-share interval interests associated with the units. Because the County's valuation method complies with Arizona Revised Statutes ("A.R.S.") section 33–1204 (2000), we conclude that the County did not exceed its authority in adopting its sales comparison valuation method. We therefore affirm.

## BACKGROUND

¶ 2 The appellants are London Bridge Resort, Inc. and Resort Association, Inc. (collectively, "LBRI"). In 1986, LBRI's predecessor-in-interest [1] bought an existing hotel, land, and commercial buildings adjacent to the London Bridge in Lake Havasu City. In 1990, LBRI recorded a plat and declarations

---

1. LBRI is actually the successor to the original developer, but for the sake of clarity, we refer to the original and successor developer as LBRI.

that transformed the existing hotel into a time-share condominium project that was initially composed of 102 units. Conversion activities proceeded, and the original time-share declarations were repeatedly amended during the period 1990 through 1998. When the conversion process was complete, the project encompassed a total of 122 condominium units.

¶ 3 Each condominium unit is either a studio, a one-bedroom unit, or a two-bedroom unit. Under the time-share declarations each unit is "divided in time." The resulting divisions are called "interval interests" or "interval units." Each interval interest is associated with one of the three types of units and is designated accordingly as a "Studio Interval Unit, a One Bedroom Interval Unit, or a Two Bedroom Interval Unit." The purchaser of an interval interest receives a non-severable membership in the owners' association and the right to occupy and use one unit of the associated type for one week each year or every other year, depending on the particular interval interest purchased. Interval interests do not include rights in any particular condominium unit or any particular calendar week.

¶ 4 Each interval interest purchaser also receives, via warranty deed, an undivided fractional fee simple interest in all 122 condominium units and the common elements of the condominium project. The fraction on which a given interval interest is based is equivalent to the ratio between the average square footage of the type of unit the owner has acquired the right to occupy, and the combined square footage of the 122 units multiplied by 51. No owner or group of owners can sell a condominium unit. None of the units has been or ever can be owned separately from the other units. All sales pertaining to the condominium project are of interval interests.

¶ 5 Each condominium unit has a separate tax parcel number. The Mohave County Assessor has never assigned tax parcel numbers to interval interests. Every year since the condominium project was created, the Assessor has issued a separate valuation notice for each condominium unit. Property taxes levied on the condominium units are billed to the owners' association and are funded by the interval interest owners through regular assessments for ownership expenses.

¶ 6 In Arizona, taxable property is to be assessed at its "full cash value." A.R.S. § 42–11001(5) (Supp.2000). "Full cash value" means the value determined as set forth by statute, or if no statutory valuation method is set forth, "full cash value is synonymous with market value which means the estimate of value that is derived annually by using standard appraisal methods and techniques." *Id.* Market value is generally determined through three common appraisal approaches: capitalizing the income stream ("income method"), estimating replacement cost less depreciation ("cost method"), and estimating market value by comparable sales ("sales comparison method"). *Bus. Realty of Arizona, Inc. v. Maricopa County,* 181 Ariz. 551, 553–54, 892 P.2d 1340, 1342–43 (1995); *cf.* A.R.S. §§ 42–11054(A)(1), 42–16051(B) (1999). However, other "hybrid" methods may also be permissible. *See Recreation Cntrs. of Sun City, Inc. v. Maricopa County,* 162 Ariz. 281, 291, 782 P.2d 1174, 1184 (1989).

¶ 7 Assessors typically use the cost method to value condominium units in a new project, then switch to the sales comparison method when a sufficient number of units has been sold to render that method a reliable indicator of market value. From 1991 through 1998, every county assessor in Arizona valued all residential condominium units under either the replacement cost method or the sales comparison method, regardless of whether they were time-shared. Because no individual condominium units in the London Bridge Resort had been or could be sold as such, from 1991 through 1998 the Mohave County Assessor valued those units by the replacement cost method. But throughout that period, the Mohave County Assessor also tracked the affidavits of value filed under A.R.S. section 11–1133 (Supp.2000) on each sale of an interval interest in the London Bridge Resort. From the information reflected on those affidavits, the Assessor formed the opinion that a significant component of value inhering in time-share condominium units was escaping assessment.

¶ 8 The Assessor's office formulated a new methodology for valuing time-share condominium units and applied it in valuing the London Bridge Resort units for tax years 1999 and 2000. Under this methodology, the Assessor first determined the most probable sales prices of interval interests in studio, one-bedroom, and two-bedroom units, respectively, using recent market sales of such interests. Each such price was then multiplied by the number of interval interests sold or available for sale for each type of unit. This yielded a "gross market value" for each type of condominium unit.

¶ 9 The gross market values were then reduced by 50% to account for

extraordinary initial marketing costs, business going concern value, excess sales commission costs, unusual financing, arms-length transaction irregularities, atypical developer risk, extended marketing time and other non-realty intangibles such as vacation conveniences and services, exchange privileges and unusual closing costs.

The Assessor reduced each gross market value by an additional 10% to account for personal property. Twenty percent of the remaining amount was then deducted "as an equity adjustment to account for the general level of assessment in Arizona and Mohave County."

¶ 10 In summary, Mohave County's valuation process for 1999 and 2000, began by taking an average of recent selling prices of interval interests for each of the three condominium unit categories and multiplying those averages by the corresponding number of interval interests for each category. After discounting the results by a uniform rate of 68% to account for non-real estate factors, the County ascribed the final figures to every individual unit in the categories to which they pertained, yielding identical valuations and tax bills for all units in each category.

¶ 11 For 1999, this methodology yielded a valuation of $128,928 for each studio unit, $186,472 for each one-bedroom unit, and $238,724 for each two-bedroom unit, inclusive

of value attributed to land. The aggregate valuation of the 122 condominium units was approximately $25 million for 1999.

¶ 12 LBRI appealed the 1999 valuations to the Mohave County Board of Equalization. The Board sustained the Assessor's valuations. LBRI and the owners' association appealed the Board's ruling, and later appealed the Assessor's valuations for 2000, to the tax court. The tax court appeals were consolidated.

¶ 13 On cross-motions for partial summary judgment, the tax court ruled for Mohave County. The tax court rejected LBRI's challenge and concluded that LBRI's position would create an unauthorized property tax exemption for time-share interval units in violation of Article 9, Section 2(12) of the Arizona Constitution.[2] Observing that any of the standard appraisal methods may be used in determining full cash value, the tax court concluded that the Assessor's "method of valuing the London Bridge Resort time-share condominium units using a market-based approach is permissible, and presumed competent."

¶ 14 Before judgment was entered, the parties entered a partial settlement agreement for the purpose of focusing the case on the legality of Mohave County's time-share condominium valuation method and avoiding the expense and delay of litigating the actual values of the 122 units. They stipulated that, for both 1999 and 2000, the aggregate full cash values of the units would be fixed at $19.5 million if Mohave County's valuation method were found legally permissible and at $8 million if it were not. The tax court's judgment accordingly set the aggregate full cash value at $19.5 million, assigning $100,222, $144,954, and $185,575 as full cash values for studio, one-bedroom, and two-bedroom condominium units, respectively.

## DISCUSSION

¶ 15 On appeal from summary judgment in which the material facts are not in dispute, we review *de novo* whether the ap-

2. Article 9, Section 2(12) provides the following: "All property in the state not exempt under the laws of the United States or under this constitu- tion or exempt by law under the provisions of this section shall be subject to taxation to be ascertained as provided by law."

pellee was entitled to judgment as a matter of law. *Cable Plus Co. v. Arizona Dep't of Revenue*, 197 Ariz. 507, 509, ¶ 10, 4 P.3d 1050, 1052 (App.2000) (citation omitted); *Blum v. State*, 171 Ariz. 201, 203–04, 829 P.2d 1247, 1249–50 (App.1992) (citations omitted).

## I. Direct Taxation of Time-share Intervals

¶ 16 The tax court apparently accepted LBRI's contention that Mohave County's valuation method directly assessed and taxed time-share interval interests, but disagreed with its contention that counties have no authority to do so. The tax court concluded instead that the Arizona Constitution, Article 9, Sections 2(2) and (2)(12), required Arizona counties to assess and tax interval interests regardless whether specific statutory authority existed. Before we examine LBRI's contention itself, we comment briefly on the rationale by which the court resolved it.

¶ 17 It is evident that the tax court made its ruling without benefit of this court's then-recent opinion in *Airport Properties v. Maricopa County*, 195 Ariz. 89, 985 P.2d 574 (App.1999). There we rejected the view that Article 9, Section 2(12) of the Arizona Constitution requires *ad valorem* taxation of every conceivable variety of property not expressly exempted by federal law, the Arizona Constitution, or statutory exemption authorized by Article 9, Section 2(2) (property of charitable, educational, religious, or non-profit institutions). *See Airport Props.*, 195 Ariz. at 99, ¶ 36, 985 P.2d at 584. We reached this conclusion based on the plain language of Article 9, Section 2(12), its history and treatment in the Arizona case law, and "the yardstick of common sense." *Id.* at 99–104, ¶¶ 36–59, 985 P.2d at 584–89; *see also Maricopa County v. Fox Riverside Theatre Corp.*, 57 Ariz. 407, 408–15, 114 P.2d 245, 246–48 (1941) (holding that because the legislature had set up no machinery by which taxation of leasehold interests in public property could be carried into effect, the legislature had not exercised its power to tax such interests and thus an injunction against Maricopa County's assessment of taxes on such interests was appropriate).

¶ 18 In light of *Airport Properties*, the tax court's rationale for its ruling was incorrect. The question whether to tax time-share interval interests as such is within the discretion of the legislature. *Airport Props.*, 195 Ariz. at 100–01, ¶ 40, 985 P.2d at 585–86; *see also Fox Riverside Theatre Corp.*, 57 Ariz. at 409–12, 114 P.2d at 246–47. Article 9, Section 2(12), neither requires nor permits county assessors to assess any distinct category of property that the legislature has not determined to tax. *See Airport Props.*, 195 Ariz. at 100–01, ¶ 40, 985 P.2d at 585–86.

¶ 19 We nevertheless conclude that the tax court correctly ruled against appellants because the tax was imposed on condominiums, not time-share intervals, and because the method employed by the County for valuing the condominiums was legally permissible.

## II. Mohave County's Valuation Method for Time-share Condominium Units

### A. Tax on Condominiums

¶ 20 LBRI argues that the County exceeded its taxing authority by imposing a direct tax on time-share intervals without legislative authorization. We reject this argument. Although the County may not tax categories of property that the legislature has not determined to tax, the County is required to identify and value those categories of property that the legislature has determined to tax. *See* A.R.S. § 42–13051(A), (B)(2) (1999). The legislature has determined to tax condominiums. *See* A.R.S § 33–1204. In determining the value of property identified for taxation, the County is required to take into consideration the "current usage" of the property. *See* A.R.S. § 42–11054(B) ("In applying prescribed standard appraisal methods and techniques, current usage shall be included in the formula for reaching a determination of full cash value."). "Current usage" is defined as "the use to which the property is put at the time of valuation by the assessor or the department." A.R.S. § 42–11001(4).

¶ 21 Here, the property identified for taxation is condominium units. Mohave County has never assigned tax parcel numbers to London Bridge Resort interval interests as

such. Instead, the tax parcel numbers upon which the tax is based are those assigned to the 122 individual condominium units. In valuing those condominium units, the County Assessor considered the time-share regime as an appropriate indication of the current usage of the condominiums affecting value. Because valuation requires consideration of the condominiums' current usage under a time-share regime, the County imposed a permissible assessment on condominium units. The County thus did not exceed its authority under Article 9, Section 2(12) and *Airport Properties.*

### B. Permissibility of the Valuation Method

¶ 22 Despite the fact that condominiums—not interval interests—are being assessed, LBRI argues that the County's method of valuing condominiums by relying on recent sales prices of time-share interval interests is not legally permissible because it allegedly fails to tax and assess each unit separately, as required by A.R.S. section 33–1204(B). In addressing this argument, we first consider a county assessor's statutory duties and obligations regarding valuation and assessment, and then address LBRI's substantive arguments regarding the Assessor's valuation methodology in this case.

### 1. Assessment Duties and Obligations of the County Assessor

¶ 23 As discussed above, a county assessor is required to identify and "[d]etermine the full cash value" of all taxable property within the county. A.R.S. § 42–13051(B)(2). In the absence of a statutorily defined method of determining "full cash value," the term is "synonymous with market value which means the estimate of value that is derived annually by using standard appraisal methods and techniques." A.R.S. § 42–11001(5).

¶ 24 Among the three commonly accepted valuation methods, county assessors have discretion in choosing the method by which a given piece of property will be valued. *See Mohave County v. Duval Corp.,* 119 Ariz. 105, 106, 579 P.2d 1075, 1076 (1978) (noting that the taxpayer is not entitled to choose which method the county assessor

applies, nor, when the method is challenged, is the court entitled to grant a taxpayer relief simply because the court feels a different method would have been preferable) (citations omitted). In addition, the supreme court has adopted an approach under which the three standard appraisal methods are not to be applied mechanically, but rather pragmatically, in a way that ultimately determines and taxes the intrinsic value of the property in question. *Recreation Cntrs. of Sun City,* 162 Ariz. at 288–91, 782 P.2d at 1181–84 ("The assessor may utilize any appraisal approach or hybrid method of appraisal that takes the principles explained in this opinion into consideration.").

¶ 25 With these principles in mind, it is generally recognized that the sales comparison method is the most accurate and reliable valuation method, particularly with respect to property commonly sold in the marketplace, such as residential property. *See* Ariz. Dep't of Revenue, Assessment Procedures Manual 2.1.3 (1995) ("For those properties that are commonly sold in the market place, such as residential properties, the sales comparison approach is best suited."); Ariz. Dep't of Revenue, Land Manual 4.8–9 (2001) ("The Direct Sales Comparison Method is the most accurate, reliable and defensible method of valuing land. The remaining Alternative Methods are far less reliable, and should be utilized only in the absence of adequate market sales activity."); Ariz. Dep't of Revenue, Publication 546: Residential Property, *available at* http://www.revenue.state.az.us/property/pub546.htm. ("[T]he majority of single-family homes and condominiums in Arizona are valued using the sales [comparison] method."). Thus, in the condominium context, assessment by the sales comparison method is generally preferred as soon as a sufficient number of condominiums have been sold.

### 2. A.R.S. Section 33–1204

¶ 26 Here, Mohave County in essence formulated a hybrid sales comparison method that incorporated a factor designed to determine the intrinsic value of the respective types of units. The Assessor's method took into account the condominium units'

"current usage" as time-shares whose market value depends solely on each unit's status as a studio, one-bedroom, or two-bedroom condominium unit. LBRI challenges this valuation method, relying primarily on A.R.S. section 33–1204, which provides in relevant part the following:

> A. If there is a unit owner other than a declarant, each unit that has been created, together with its interest in the common elements, constitutes for all purposes a separate parcel of real estate.
>
> B. Except as provided in subsection C, **if there is a unit owner other than a declarant, each unit shall be separately taxed and assessed,** and no separate tax or assessment may be rendered against any common elements.
>
> . . . .
>
> D. If there is no unit owner other than a declarant, the real estate comprising the condominium shall be taxed and assessed as a single parcel.

(Emphasis added.) Based on subsection B of this statute, LBRI argues that because interval interests in the Resort have been sold, there are "unit owner[s]"[3] other than declarant LBRI, and thus each of the 122 condominium units must be "separately taxed and assessed." Relying on *Crystal Point Joint Venture v. Arizona Department of Revenue,* 188 Ariz. 96, 932 P.2d 1367 (App.1997), and case law from other jurisdictions, LBRI contends that because Mohave County's valuation method does not value each of the Resort's 122 condominium units individually, section 33–1204(B) precludes the County's valuation method. We disagree with LBRI's characterization and conclude that the County's method complies with section 33–1204(B) because it taxes and assesses each unit separately based upon the property's "current usage" and a consideration of the relevant characteristics of each unit in the marketplace.

¶ 27 Preliminarily, we note that the language of A.R.S. section 33–1204 and the definitions of "unit" and "unit owner" suggest that the legislature did not envision application of this statute to time-share regimes in which no discrete group of interval interest holders owns any discrete condominium unit. The language of these provisions presupposes that the condominium "units" in question are physical objects of ownership that are each capable of being sold outright as a discrete unit to a single buyer. The issues with which the operative language of each subsection deals are those that would logically arise from that general background. The legal effect of each subsection turns on whether the declarant is still the sole owner of all such physical units, or instead has transferred ownership of one or more of them. None of the language in section 33–1204 contains any suggestion that the drafters of the statute crafted its provisions to apply to condominium projects subject to a time-share regime in which no "units" within the meaning of section 33–1204 are ever sold or owned as such. Nevertheless, because we do not believe that the requirements of section 33–1204 and the County Assessor's valuation methodology are substantively irreconcilable, we resolve LBRI's challenge within the framework of section 33–1204.

¶ 28 LBRI's disagreement with the Assessor's methodology rests on the mistaken assumption that "separately taxed and assessed" necessarily requires the Assessor to consider all of the unique characteristics of each unit, such as square footage, location, and view, in determining its individual value. We reject this overly broad construction. Separately taxing and assessing each unit requires the Assessor to consider only those unique characteristics of each unit that are relevant to a determination of the unit's "full cash value," which is synonymous with "market value." Here, characteristics such as square footage, location, and view are not relevant to the condominiums' market value. Although such unique characteristics may be, and usually are, relevant in determining value under ordinary condominium regimes, they are completely irrelevant to valuation under LBRI's "current usage" of the property as an interval interest time-share regime.

---

**3.** " 'Unit owner' means a declarant or other person who owns a unit. . . ." A.R.S. § 33–1202(23) (2000). "Unit" in turn means "a portion of the condominium designated for separate ownership or occupancy." A.R.S. § 33–1202(22).

¶ 29 Under LBRI's "current usage," the value·of any individual unit depends solely on the unit's status as a studio, a one-bedroom, or a two-bedroom unit. Thus, although one studio unit may be in a better location or may have more square footage or a better view than another studio unit, its value in the marketplace does not depend on these distinctions. Therefore, the County is not required to consider any such distinctions in determining each unit's full cash value. Requiring the County to determine market value and then forcing it to consider factors which, in context, are irrelevant to market value is patently illogical, and we therefore decline to interpret section 33–1204(B) as requiring that result. *See Zaritsky v. Davis,* 198 Ariz. 599, 603, ¶ 11, 12 P.3d 1203, 1207 (App.2000) (stating that in interpreting statutes, we must avoid constructions that lead to absurd results) (citations omitted); *Lake Havasu City v. Mohave County,* 138 Ariz. 552, 557, 675 P.2d 1371, 1376 (App.1983) ("Statutes must be given a sensible construction which will avoid absurd results.") (citations omitted).

¶ 30 Additionally, LBRI's position is inconsistent. On the one hand, LBRI has established a regime that effectively deprives each unit of the value inherent in its unique characteristics of square footage, view, etc. On the other hand, LBRI demands that the Assessor make her assessment valuations based on the same characteristics that LBRI has rendered irrelevant in its own marketing methodology. For LBRI and the market to which its sales are directed, the only unique characteristic of value in each unit is its status as a studio, a one-bedroom, or a two-bedroom unit. Because LBRI and the market consider the units to be of equal value despite any unique characteristics of square footage, location, and view, the Assessor can do the same.

¶ 31 In summary, we conclude that the Assessor's methodology complies with the requirements of section 33–1204(B) by taxing and assessing separately each unit, based upon the property's "current usage" and the characteristics of each unit that are relevant to value in the marketplace—namely, the unit's status as a studio, one-bedroom, or two-bedroom unit. The Assessor is not required to consider characteristics that are unique, but irrelevant, to value in the marketplace. That such a methodology results in an identical valuation for each category of units does not necessarily violate section 33–1204(B)'s separate assessment requirement.

¶ 32 LBRI's reliance on *Crystal Point Joint Venture v. Arizona Department of Revenue* is misplaced. There, we did no more than apply section 33–1204(B) to one of the controversies that it was plainly designed to resolve—a dispute about the circumstances under which a group of condominium units, whose ownership the declarant retained, could be valued, assessed, and taxed as a single parcel of real property. We held that, under A.R.S. section 33–1204, "if even one unit in the complex is owned by someone other than the declarant, every unit must be treated as a separate parcel of real estate and separately valued, assessed, and taxed." *Crystal Point Joint Venture,* 188 Ariz. at 101, 932 P.2d at 1372. But if a declarant owns every unit, the "units that comprise the complex are to be valued, assessed, and taxed as a single parcel." *Id.* Based on this analysis, we rejected the taxpayer's proposed "bulk sales" valuation method, representing "what *one* willing buyer would have paid for *all* the units." *Id.* at 99, 932 P.2d at 1370. Thus, in our view, *Crystal Point* does not support appellants' position in this very different litigation. *Crystal Point* dealt with a traditional condominium project in which separate owners purchased discrete units. Here, we are dealing with a "non-traditional" condominium project in which no individual owner or group of owners purchase any individual unit. Further, the County's valuation method does not involve a bulk sales valuation. Rather, the County's valuation method appraised each unit separately based upon the characteristics that determine its value in the marketplace. *Crystal Point* is not to the contrary.

¶ 33 LBRI also cites several cases from other jurisdictions that have determined that statutes similar to section 33–1204 preclude taxing authorities from valuing time-share condominium units by reference to the values of time-share interval interests. *Hausman*

*v. VTSI, Inc.,* 482 So.2d 428 (Fla.Dist.Ct.App. 1985); *Inn Group Assocs. v. Booth,* 593 A.2d 49 (R.I.1991); *New England Marketing Assocs.,* 128 N.H. 750, 519 A.2d 303 (1986). None of these decisions provides persuasive support for LBRI's position.

¶ 34 In *Hausman,* the court based its holding in part on a provision in Florida's time-share statutes that prohibited the courts from interpreting them as changing existing assessment procedures based on the subjection of property to a time-share regime. *Hausman,* 482 So.2d at 430 (citing Fla. Stat. ch. 721.03(3) (1981)). Given the applicable Florida law, the Florida court's conclusion that the pre-existing statutory requirement for separate assessment of "condominium parcel[s]" applied to condominium projects was understandable. Arizona, however, has no statutory provision analogous to the Florida statute upon which the court in *Hausman* relied.

¶ 35 *Inn Group Associates* and *New England Marketing Associates* are similarly unpersuasive. The courts in those cases offered no explanation for the view that the language of their respective statutes contemplated application to condominium projects in which the individual physical units were not owned and sold as such, but rather were subjected to time-share regimes. Moreover, none of the jurisdictions from which *Hausman, Inn Group Associates,* and *New England Marketing Associates* arose appears to have pursued anything like the pragmatic, flexible approach to property tax valuation announced in *Recreation Centers. See Recreation Cntrs. of Sun City,* 162 Ariz. at 291, 782 P.2d at 1184 (allowing assessors to develop appropriate "hybrid" methods in valuing property for taxation). Nor did any of those cases involve a statutory requirement that counties consider the property's "current usage" in determining market value.

## CONCLUSION

¶ 36 Mohave County's valuation method does not amount to taxation of time-share intervals without legislative authorization. Also, it complies with section 33–1204(B)'s requirement that condominium units be assessed and taxed "separately." Therefore, the Assessor permissibly considered the estimated market values of time-share interval interests in valuing condominium units.

¶ 37 The parties have not asked us to determine whether the details of Mohave County's method, as opposed to the method's underlying principle, yielded results that are defensible as a matter of fact based on professional appraisal principles. We offer no opinion on the latter question, and instead give effect to the parties' stipulation concerning the appropriate numerical results for this litigation.

¶ 38 LBRI requests an award of attorneys' fees on appeal under A.R.S. sections 12–348 and 12–349. Because LBRI does not prevail, we deny its request.

¶ 39 The judgment is affirmed.

CONCURRING: SHELDON H. WEISBERG, Presiding Judge, and E.G. NOYES, Jr., Judge.