IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

**MESQUITE POWER, LLC,**
*Plaintiff/Appellee,*

*v.*

**ARIZONA DEPARTMENT OF REVENUE**
*Defendant/Appellant.*

No.  CV-23-0016-PR
**Filed July 22, 2024**

Appeal from the Arizona Tax Court
The Honorable Danielle J. Viola, Judge
No.  TX2018-000928
**REVERSED AND REMANDED**

Opinion of the Court of Appeals, Division One
254 Ariz. 355 (App. 2022)
**VACATED**

COUNSEL:

Paul J. Mooney (argued), Bart S. Wilhoit, Mooney, Wright, Moore & Wilhoit, PLLC, Scottsdale, Attorneys for Mesquite Power, LLC

Kristin K. Mayes, Attorney General, Lisa Neuville (argued), Kimberly Cygan, Jerry A. Fries, Assistant Attorneys General, Arizona Attorney General's Office, Phoenix, Attorneys for Arizona Department of Revenue and County of Maricopa

James R. Nearhood, Nearhood Law Offices, PLC, Scottsdale, Attorney for Amici Curiae WSATR and NAPTR-TEC

Douglas S. John, Frazer Ryan Goldberg & Arnold, LLP, Phoenix, Attorney for Amicus Curiae Griffith Energy, LLC

Greg Patterson, Arizona Competitive Power Alliance, Tempe; Thomas A. Denker, Tyler J. Michalowski, Munger, Chadwick & Denker, P.L.C., Tucson, Attorneys for Amicus Curiae Arizona Competitive Power Alliance

Bennett Evan Cooper, Dawn R. Gabel, Dickinson Wright PLLC, Phoenix, Attorneys for Amicus Curiae Arizona Tax Research Association

---

JUSTICE KING authored the Opinion of the Court, in which CHIEF JUSTICE TIMMER, VICE CHIEF JUSTICE LOPEZ, and JUSTICES BOLICK and BEENE joined.[*]

---

JUSTICE KING, Opinion of the Court:

¶1         This case involves the proper valuation of an electric generation facility for property tax purposes.  Mesquite Power, LLC ("Mesquite") owns the subject property known as Mesquite Power Station Block 2 (the "Mesquite Power Plant").  Through a "Power Purchase Agreement" between Mesquite and a group of buyers (the "Buyers"), Mesquite guarantees the Buyers a specific amount of electrical capacity during a particular period.  In turn, Mesquite receives fixed payments from the Buyers.

¶2         For tax year 2019, the Arizona Department of Revenue ("ADOR") calculated the full cash value of the Mesquite Power Plant under A.R.S. § 42-14156.  Mesquite challenged that statutory valuation in tax court under A.R.S. § 42-14005(2), relying on the income approach to

---

[*]  Justice Robert M. Brutinel and Justice William G. Montgomery recused themselves from this matter.

valuation. *See* A.R.S. § 42-16204. The parties dispute whether the income approach permits consideration of income from the Power Purchase Agreement when valuing the Mesquite Power Plant for property tax purposes. We conclude that income from the Power Purchase Agreement is not automatically and entirely irrelevant to the Mesquite Power Plant's valuation under the income approach. Such income may be considered in the valuation if it is relevant to the calculation of income derivable from the property itself by continued use as a power plant.

¶3 We further conclude that A.R.S. § 42-11054(C)(1)—which provides that the property's "[c]urrent usage shall be included" in the valuation—does not require consideration of the Power Purchase Agreement.

## BACKGROUND

¶4 Sempra U.S. Gas & Power LLC ("Sempra") originally built the Mesquite Power Plant in 2003. In 2015, Sempra sold the facility and its accompanying business to ArcLight Capital Partners, LLC ("ArcLight") for nearly $357,000,000. ArcLight spent over $27,000,000 making capital improvements to the property. Then, in 2018, ArcLight sold all rights, titles, and interests in Mesquite's business, including ownership of the Mesquite Power Plant, to Southwest Generation Operating Company, LLC ("Southwest") for nearly $556,000,000.[1] Southwest currently owns Mesquite.

¶5 The Mesquite Power Plant is a "base load plant" designed to run continuously absent maintenance or shutdowns. It is also a "merchant plant," meaning that Mesquite sells the electricity that the Mesquite Power Plant generates to third parties. A power plant's capacity is measured in terms of the megawatts it generates. The Mesquite Power Plant has a net operating capacity of 625 megawatts.

¶6 Southwest's purchase of the Mesquite Power Plant from ArcLight included the transfer of the Power Purchase Agreement—an

---

[1] Some of these transactions involved wholly owned subsidiaries of the entities identified herein. We have omitted reference to the wholly owned subsidiaries for ease of reference.

agreement between Mesquite and the Buyers. The Buyers are a collective group of electric utilities, municipalities, power cooperatives, tribal utility authorities, irrigation districts, electrical districts, as well as other entities authorized to sell power to consumers.

¶7 The Power Purchase Agreement guarantees the Buyers a specific amount of electrical capacity in exchange for the Buyers' fixed payments to Mesquite. The Buyers' payments to Mesquite are mandatory and remain the same whether the Buyers actually take delivery of any power. The Power Purchase Agreement does not require that the Mesquite Power Plant produce the electricity that fulfills Mesquite's obligations to the Buyers. Mesquite may purchase power on the open market or from another source to cover the capacity guarantee to the Buyers. The Power Purchase Agreement provides that, with the Buyers' prior approval, the agreement may be severed from the Mesquite Power Plant and transferred separately.

¶8 The original Power Purchase Agreement was entered into in 2011, and it guaranteed the Buyers up to 241 megawatts of electrical capacity over a designated period. In 2013, an amended agreement increased that number to 271 megawatts of electrical capacity. In return, the Buyers paid Mesquite approximately $34,000,000 per year, as well as certain operation and maintenance costs for the plant. In 2017, the agreement was amended again—increasing the Buyers' guarantee to 475 megawatts of electrical capacity, beginning in 2021 and effective through 2046. In exchange, the guaranteed payments increased to about $48,000,000 per year in 2021.

¶9 Arizona Revised Statute § 42-14151(A)(4) requires ADOR to "annually determine the valuation, in the manner prescribed by this article, of all property, owned or leased, and used by taxpayers in the . . . [o]peration of an electric generation facility." Section 42-14156 requires ADOR to use a cost-based approach in the agency's statutory valuation of electric generation facilities. *See* A.R.S. § 42-11001(6) ("'Full cash value,' for property tax purposes, means the value determined as prescribed by statute."); *see also Griffith Energy L.L.C. v. Ariz. Dep't of Revenue*, 210 Ariz. 132, 137 ¶ 24 (App. 2005) ("By enacting § 42-14156, the legislature required ADOR to use a cost approach in valuing electric generation property for purposes of property taxation, with specified

adjustments to scheduled depreciation over a five-year period."). Section 42-14156 requires, among other things, a determination of the value of land, real property improvements, and personal property used in operating the facility by evaluating the "cost" of each. § 42-14156(A). "Cost" means "the cost of constructing the property or acquiring the property in an arm's length transaction." § 42-14156(A)(6)(a). For tax year 2019, ADOR valued the property comprising the Mesquite Power Plant at $196,870,000 based on the formula for electric generation facilities in § 42-14156.

**¶10** Mesquite challenged ADOR's statutory valuation of the Mesquite Power Plant in tax court. *See* § 42-14005(2) ("A property owner who is not satisfied with the valuation of the owner's property as determined by the department may appeal . . . [d]irectly to superior court pursuant to section 42-16204."). Mesquite did not argue that ADOR incorrectly applied the statutory formula when determining the value of the Mesquite Power Plant under § 42-14156. Instead, Mesquite claimed that ADOR's full cash value calculation under § 42-14156 exceeded the market value of the property in violation of § 42-11001(6) (stating that "[f]ull cash value shall not be greater than market value regardless of the method prescribed to determine value for property tax purposes").

**¶11** Mesquite moved for partial summary judgment on whether the Power Purchase Agreement could be considered in the property valuation. The tax court entered partial summary judgment for Mesquite, ruling that the Power Purchase Agreement "is a 'non-taxable, intangible asset' that is separate and severable from the tangible property and the valuation of Mesquite's tangible property for property tax purposes cannot include the value of the [Power Purchase Agreement]." The tax court, however, denied Mesquite's motion "as to whether cash flows attributable to the [Power Purchase Agreement] can be considered as part of the valuation of Mesquite's property."

**¶12** Thereafter, the tax court had to decide whether Mesquite had met its burden of establishing that the statutorily derived full cash value determined by ADOR exceeded the property's market value. "Fair market value is . . . that 'amount at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the

5

relevant facts.'" *Bus. Realty of Ariz. v. Maricopa County*, 181 Ariz. 551, 553 (1995) (quoting *Fair Market Value*, Black's Law Dictionary (6th ed. 1990)).

¶**13** In property taxation, market value is "the estimate of value that is derived annually by using standard appraisal methods and techniques." § 42-11001(6). Market value is "determined by use of three common appraisal approaches:" (1) "capitalizing the income stream" (income approach), (2) "estimating replacement cost less depreciation" (cost approach), and (3) "estimating market value by comparable sales" (market or sales comparison approach). *Bus. Realty*, 181 Ariz. at 553–54; *see also* A.R.S. § 42-16051(B)(1)–(3) (identifying income, market, and cost approaches to property valuation); *Mohave County v. Duval Corp.*, 119 Ariz. 105, 106 (1978) ("There are three accepted approaches to estimating value: (1) the reproduction cost of the property, (2) income projected into the future (capitalization of income), and (3) market data appraisal which is the comparison of sales of similar property."); *Maricopa County v. Sperry Rand Corp.*, 112 Ariz. 579, 581 (1976) ("The three commonly recognized approaches to value (cost, income, and market) should be considered . . . .").

¶**14** At trial, Mesquite offered expert testimony that the market value of the Mesquite Power Plant was $105,000,000. In contrast, ADOR offered expert testimony that the market value was $432,000,000—a significant increase from its statutory valuation.

¶**15** The experts for ADOR and Mesquite considered the three standard appraisal approaches but differed as to the weight given to each approach. ADOR's expert gave some weight to each of the three approaches. Mesquite's expert relied on the income approach, claiming it is the method most relied on by buyers and sellers in the industry, and did not give weight to the cost or market approaches.

¶**16** Using the income approach, Mesquite's expert valuation did not include income from the Power Purchase Agreement. Instead, Mesquite's valuation included income from what it considered the taxable property, constructing a hypothetical income model for the property that valued the Mesquite Power Plant as a merchant base load plant competing in the market by selling energy at wholesale prices. In contrast, ADOR's expert valuation under the income approach included income from the Power Purchase Agreement and did not deduct the value of the Power

Purchase Agreement. The tax court agreed with Mesquite's valuation, finding that the value of the property was $105,000,000 for the 2019 tax year. ADOR appealed.

¶17 The court of appeals disagreed with the tax court, holding "that where intangible assets enhance the real and tangible property's value, a competent appraisal must consider the effect such intangible assets have on the taxable property's value." *Mesquite Power, LLC v. Ariz. Dep't of Revenue*, 254 Ariz. 355, 357 ¶ 2 (App. 2022). Further, "any valuation approach must appraise the operating unit by its current usage to be competent," and "Mesquite's appraisal is inappropriate under the circumstances because, by assuming the [Power] Purchase Agreement does not exist, it does not reflect the property as it is." *Id.* at 364 ¶ 51. In sum, the court concluded that the Power Purchase Agreement "enhances the value of Mesquite's taxable property because it contributes to the plant's cash flows and current usage. Thus, it must be considered in determining the property's value." *Id.* at 361 ¶ 35. The court vacated the tax court's judgment and remanded with instructions. *Id.* at 364 ¶ 52.

¶18 We granted review because this case presents recurring issues of statewide importance. We have jurisdiction pursuant to article 6, section 5(3) of the Arizona Constitution.

## DISCUSSION

¶19 "We review questions of statutory interpretation de novo." *See State v. Santillanes*, 256 Ariz. 480, 484 ¶ 11 (2024) (quoting *State v. Jones*, 246 Ariz. 452, 454 ¶ 5 (2019)). We also review "mixed questions of law and fact de novo." *Brush & Nib Studio, LC v. City of Phoenix*, 247 Ariz. 269, 278 ¶ 28 (2019).

## A. May Income Generated From The Power Purchase Agreement Be Considered Under The Income Approach To Valuation?

¶20 The Arizona Constitution provides that "[a]ll property in this state that is not exempt under the laws of the United States or under this section is subject to taxation as provided by law." Ariz. Const. art. 9, § 2(A); *see also* A.R.S. § 42-11002 ("All property in this state is subject to taxation except as provided in article IX, Constitution of Arizona, and article 3 of this chapter."). "Four general elements comprise the formula

by which Arizona measures a property tax: classification, valuation, assessment ratio, and tax rate." *Aileen H. Char Life Int. v. Maricopa County*, 208 Ariz. 286, 291 ¶ 8 (2004). The second element—valuation—is at issue in this case.

**¶21** The statutory valuation that ADOR must annually determine for electric generation facilities is found in § 42-14156. An "[e]lectric generation facility" is defined as "all land, buildings and personal property that is situated in this state and that is used or useful for the generation of electric power." § 42-14156(B)(1).

**¶22** In a property tax appeal, the valuation approved by ADOR "is presumed to be correct and lawful." A.R.S. § 42-16212(B). But a taxpayer may meet its burden of rebutting the statutory presumption by presenting "competent evidence" of an excessive valuation. *Golder v. Dep't of Revenue*, 123 Ariz. 260, 263 (1979); *see also* § 42-16212(B) (allowing parties to present evidence of any matters related to the valuation of the property at a hearing). "Evidence is competent for the purposes of rebutting the statutory presumption and of showing that the Department's valuation was excessive when it is derived by standard appraisal methods and techniques which are shown to be appropriate under the particular circumstances involved." *Inspiration Consol. Copper Co. v. Ariz. Dep't of Revenue*, 147 Ariz. 216, 223 (App. 1985), *superseded by statute on other grounds*, 1990 Ariz. Sess. Laws ch. 360, § 1 (2d Reg. Sess.); *see also Golder*, 123 Ariz. at 263 ("Where the taxpayer presents evidence based upon different methods of assessment than those used by the state, that evidence is not competent unless the taxpayer can demonstrate that the appraisal methods used are appropriate in the given circumstances."); *Eurofresh, Inc. v. Graham County*, 218 Ariz. 382, 386 ¶ 17 (App. 2007) ("If the taxpayer uses a different valuation method than the taxing authority, the taxpayer's evidence is not competent unless it demonstrates that its method was appropriate under the circumstances."). Therefore, to rebut ADOR's statutory valuation, a property owner like Mesquite may use standard appraisal methods that are appropriate under the particular circumstances.

**¶23** As discussed, Arizona law recognizes three standard appraisal approaches for property valuation. *Bus. Realty*, 181 Ariz. at 553–54. In some instances, "it may be error to use only one method without consideration of the others." *Sperry Rand Corp.*, 112 Ariz. at 581; *see also id.* at 582 (declining to accept "appellants' position that the cost

method was the only way to value the property" and noting that the "evidence offered . . . was to the effect that the cost method was not the superior method for valuing this property"). But there are other "instances when only one method or approach to value can be used." *Id.* at 581.

¶24 In sum, § 42-14156 uses a cost-based approach to determine the full cash value of an electric generation facility. Mesquite does not claim that ADOR improperly valued the Mesquite Power Plant under § 42-14156. Instead, Mesquite argues that ADOR's statutory value exceeds the property's market value in violation of § 42-11001(6). A taxpayer may use a standard appraisal method like the income approach to rebut ADOR's statutory valuation as improperly exceeding the property's market valuation, if that approach is "appropriate under the particular circumstances." *See Inspiration Consol. Copper Co.*, 147 Ariz. at 223; *see also* § 42-11001(6). It is within that context that we consider how the income approach should be applied to identify the property's market value.

¶25 Mesquite's expert relied on the income approach to valuation in its appeal challenging ADOR's statutory valuation. As noted, the parties disagree whether income from the Power Purchase Agreement may be considered under the income approach. ADOR claims that the Power Purchase Agreement impacts Mesquite's market value and that income from such an agreement should be considered under the income approach. Conversely, Mesquite argues that the Power Purchase Agreement is legally irrelevant and should be entirely disregarded; instead, a hypothetical income model should be constructed to properly value the property, as Mesquite's expert presented to the tax court here.

¶26 A property tax "is against the property itself." *Recreation Ctrs. of Sun City, Inc. v. Maricopa County*, 162 Ariz. 281, 286 (1989). As this Court explained in *Recreation Centers*:

> Under established Arizona law, property burdened by long term leases or mortgages is not appraised at its potentially restricted selling price, but is compared to similar property without such burdens. Even if such encumbrances make a particular property more or less desirable to a prospective buyer, the assessed value for tax purposes is not affected.

*Id.* at 285 (internal citations omitted) (citing *Steinfeld v. State*, 37 Ariz. 389, 393 (1930) (addressing a mortgage), *Magna Inv. & Dev. Corp. v. Pima County*, 128 Ariz. 291, 294 (App. 1981) ("Appellants correctly recognize that in fixing the full cash value of land, the effect of existing leases on the value of [sic] to the owner should not be relied upon"; "the fact that a lease unfavorable to the owner encumbers the property does not lower its full cash value."), and *Caldwell v. Dep't of Revenue*, 122 Ariz. 519, 521 (App. 1979) (holding an unfavorable lease that makes a property less desirable to prospective buyers does not affect the property's full cash value)). "[B]ecause the tax is against the property itself, the fee owner's personal financial status is irrelevant." *Id.* at 286; *see also Maricopa County v. Trs. of Ariz. Lodge No. 2* ("*Trustees of Arizona Lodge*"), 52 Ariz. 329, 336 (1938) ("In tangibles [sic] like instruments and securities for the payment of money, such as bonds and promissory notes, are not the subject of seizure and sale under execution in the absence of express statutory authority.").

**¶27** On the one hand, the Power Purchase Agreement is an intangible business contract. If all income from such an agreement is automatically used to calculate the value of the property in all instances, this would effectively tax an intangible asset and would skew the property valuation away from the property itself.

**¶28** On the other hand, the income approach to valuation permits consideration of certain income-related information. As this Court stated in *Duval Corp.*:

> The "capitalized-income method" of valuation refers to any procedure whereby the appraiser measures the value of the property by a calculation or estimate of the income or services derived or derivable from the property by its present or potential owner. In its more usual form, it involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale.

119 Ariz. at 106 (quoting James Bonbright, *Valuation of Property* 230 (1st ed. 1937), https://archive.org/details/in.ernet.dli.2015.264371/page/n1/mode/2up). Therefore, income generated from an existing agreement is relevant as it may evidence a facility's expected income, which the income approach capitalizes to value the facility. But in that circumstance, the tax

court should consider other factors bearing on the strength of that evidence for property valuation purposes, such as whether the agreement is severable from the subject property, how many other like facilities have similar agreements, and the facility's historical role in generating the product under the agreement. And the taxpayer may demonstrate that the agreement has independent value that should be subtracted from the final expected income figure.

¶29     In this case, the core function of the Mesquite Power Plant is to generate and sell electricity, and its value under the income approach is closely connected with its ability to generate income from the sale of such electricity. Mesquite seemingly recognizes this by valuing the Mesquite Power Plant under the income approach as a base load plant competing in the market by selling electricity. Indeed, Mesquite's expert testified that the income approach is "predicated on the principle of anticipation" and is based on the "present worth of . . . the anticipated future cash flows." We conclude that income from the Power Purchase Agreement may therefore be considered under the income approach to valuation if it constitutes income derivable from the Mesquite Power Plant itself as a base load power plant.

¶30     This approach does not value an intangible contract or the effect of a property encumbrance like a deed restriction, lease, or mortgage. *See, e.g.*, *Steinfeld*, 37 Ariz. at 393; *Recreation Ctrs.*, 162 Ariz. at 285–86. Instead, it measures the value of the property itself under the well-established income approach by calculating the income derivable from the property itself as a base load power plant. *See Duval Corp.*, 119 Ariz. at 106.

¶31     The tax court must therefore consider whether income from the Power Purchase Agreement—and what portion—falls within this category. In doing so, the tax court should consider relevant factors such as whether the Power Purchase Agreement has value that is separate and independent from the Mesquite Power Plant; the plant's historical role in generating the electricity sold under the agreement, versus another source providing it; whether the plant operates independently of the agreement; and whether comparable plants in the market typically operate with similar agreements in place.

¶32   This approach permits consideration of income related to the property itself under the income approach to property valuation. It does not improperly subject an intangible asset to taxation in conflict with *Trustees of Arizona Lodge*, 52 Ariz. at 332–43 (addressing "whether revenue laws of the state require the owner of intangible personal property to pay taxes thereon"). *Trustees of Arizona Lodge* did not have before it, nor did it consider, the income approach to valuation. *Id.*

¶33   We recognize that the Power Purchase Agreement is severable from the Mesquite Power Plant (with the Buyers' prior approval) and electricity may be provided from a source other than the Mesquite Power Plant. But these facts do not conclusively demonstrate that the agreement is in fact separate and independent from the property itself. Nor do these facts negate the consideration of income with the agreement in place as potentially relevant evidence of income derivable from the property itself. As explained, Mesquite may, in turn, seek to demonstrate that the agreement has value independent from the plant itself that should be deducted from the valuation under the income approach. And if the Buyers' contractual payments fixed at the time of execution later create a loss of income (e.g., depending on fluctuating production costs and timing of delivery), the income approach takes this into consideration. But we simply cannot say, as a matter of law, that all income generated from an agreement is automatically and entirely irrelevant under the income approach to valuation.

¶34   Mesquite claims that the legislature's cost-based approach to valuing an electric generation facility under § 42-14156 limits the property that may be valued to only tangible personal property, real property, and land. In doing so, it asserts, the legislature precluded income from an electric generation facility's agreement from being considered under any valuation method used in a taxpayer challenge, including the income approach. We disagree. Section 42-14156 does not address the income approach to valuation—or restrict the income approach in any way—when a taxpayer, like Mesquite, uses this approach to challenge ADOR's statutory valuation as excessive. Further, the legislature has provided that "[f]ull cash value shall not be greater than market value regardless of the method prescribed to determine value for property tax purposes," and market value is "the estimate of value that is derived annually *by using standard appraisal methods and techniques.*" *See* § 42-11001(6) (emphasis added); *see also* § 42-16051(B)(1)–(3). Thus, § 42-14156 does not preclude consideration of

income when the income approach — a standard appraisal method — is used to challenge ADOR's statutory valuation in tax court.

¶35       Mesquite further argues that considering the Power Purchase Agreement's income would violate the Uniformity Clause of the Arizona Constitution. Ariz. Const. art. 9, § 1 ("Except as provided by section 18 of this article, all taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax . . . ."). But this issue was not preserved for appellate review. Mesquite did not raise the Uniformity Clause issue in the trial court. After the court of appeals issued its opinion, Mesquite raised the issue for the first time in a motion for reconsideration, which was denied without further briefing. Neither the trial court nor the court of appeals addressed the Uniformity Clause argument, and we decline to consider it in the first instance. *See Weitz Co. v. Heth*, 235 Ariz. 405, 412 ¶ 24 (2014).

## B. Does "Current Usage" In § 42-11054(C)(1) Require Consideration Of The Power Purchase Agreement?

¶36       The court of appeals concluded that the Power Purchase Agreement must be considered in the valuation because it contributes to the plant's "current usage" and "Mesquite cannot, consistent with reality, be valued as a plant without an in-place agreement providing a fixed income." *Mesquite Power*, 254 Ariz. at 361 ¶ 35, 362 ¶ 39. Mesquite contests this determination.

¶37       Under § 42-11054(C)(1), "[c]urrent usage shall be included in the formula for reaching a determination of full cash value" when "applying prescribed standard appraisal methods and techniques." *See also London Bridge Resort, Inc. v. Mohave County*, 200 Ariz. 462, 466 ¶ 20 (App. 2001) ("In determining the value of property identified for taxation, the County is required to take into consideration the 'current usage' of the property."). "Current usage" is defined as "the use to which property is put at the time of valuation by the assessor or [ADOR]." § 42-11001(4).

¶38       The statutory requirement to consider "current usage" eliminates the previous requirement to consider the property's "highest and best use" for valuation purposes. *See Burns v. Herberger*, 17 Ariz. App. 462, 466–67 (1972), *overruled in part on other grounds by Golder*, 123 Ariz. at 264–65.

¶39 This Court previously addressed and discussed the meaning of "current usage" in *Golder* by providing the following example: "If land is being used for agricultural purposes in the middle of urban growth," it should "be appraised on the basis of current usage." 123 Ariz. at 265. More specifically, "[i]f a market data approach were used to appraise the land, the value of surrounding land would reflect the value for future housing or commercial use. This anticipated or future use may not be used in fixing a value for the land being used as a farm." *Id.* Thus, when current use is "considered in assessing the property, *the agricultural user* is taxed only to the extent that the land has value *for agricultural purposes*." *Id.* at 265–66 (emphasis added).

¶40 *Recreation Centers* also provides clarity. 162 Ariz. at 283. There, the property had a restrictive covenant stating that the "property shall be used for the purpose of operating and maintaining a community center and recreational facilities." *Id.* The property also had "various improvements, including recreation center complexes (each consisting of a swimming pool, social and meeting halls, auditorium, craft room, and other facilities), golf courses with pro shops, and a bowling alley." *Id.* This Court held that when considering "current usage," "the department must . . . consider *the recreational use*." *Id.* at 290 (emphasis added).

¶41 In *Maricopa County v. Viola*, 251 Ariz. 276, 279–80 ¶¶ 12, 15 (App. 2021), the court of appeals described the "current use" of low-income housing tax credit properties "as low-income properties," not "ordinary properties" or a "conventional apartment complex." This was because the low-income housing tax credit program "restrict[ed] an owner's use of the property" and subjected such property "to continuing government mandates that impose operational and compliance costs, periodic monitoring, on-site inspections, and compliance reviews" and "limit[ed] who can live in [such] properties to those with a certain income or who meet other classifications (i.e., homeless, mentally ill, domestic violence victims, physically disabled)." *Id.* at 280 ¶ 15.

¶42 Accordingly, "current usage" addresses the manner in which the subject property is used at the relevant point in time. *See* § 42-11001(4); *Golder*, 123 Ariz. at 265–66; *Recreation Ctrs.*, 162 Ariz. at 283. Here, the Mesquite Power Plant's "current usage" is as a base load power plant. By its terms, the Power Purchase Agreement requires Mesquite to provide a certain amount of electrical capacity to the Buyers, but the agreement does

14

not alter or restrict the manner in which the Mesquite Power Plant property is used or what activity occurs on the property. The Power Purchase Agreement does not implicate how the property is used—as a base load power plant—at the time of valuation. Because the Power Purchase Agreement does not implicate "current usage," § 42-11054(C)(1) does not mandate consideration of the Power Purchase Agreement.

**CONCLUSION**

**¶43**        At the tax court, Mesquite's expert did not consider income from the Power Purchase Agreement under the income approach to valuation. For the reasons discussed, this valuation did not properly rebut ADOR's statutory valuation. But we do not decide whether Mesquite has rebutted ADOR's valuation at this juncture. In at least one earlier case involving Mesquite's property, the tax court ruled that the Power Purchase Agreement could not be considered. It was therefore entirely understandable that Mesquite's expert did not consider the Power Purchase Agreement when valuing the property. Mesquite should be given that opportunity now.

**¶44**        We therefore reverse the tax court's judgment and remand to the tax court for further proceedings consistent with this opinion. On remand, the tax court must give Mesquite an opportunity to offer a new valuation under the income approach consistent with this opinion, and ADOR must be given the same opportunity. We vacate the court of appeals' opinion.

**¶45**        Mesquite requested attorney fees, citing only Arizona Rule of Civil Appellate Procedure 21. Rule 21 "only establishes the procedure for claiming attorneys' fees and does not create any substantive right to them." ARCAP 21(a)(2). A claim for fees under Rule 21 "must specifically state the statute, rule, decisional law, contract, or other authority for an award of attorneys' fees. If a party fails to comply with this requirement, the appellate court may decline to award fees on that basis." *Id.* We decline Mesquite's request for attorney fees because Mesquite did not provide any legal authority for an award of fees.